2015 IL App (3d) 130869WC

NO. 3-13-0869WC

Opinion filed December 7, 2015

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| BOLINGBROOK POLICE DEPARTMENT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Will County. |
| | ) | |
| v. | ) | No. 13-MR-111 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION *et al.* | ) | Barbara Petrungaro, |
| (Michael Toles, Appellee). | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice Hoffman concurred in the judgment and opinion.
Justice Hudson dissented, with opinion, joined by Justice Harris.

**OPINION**

¶ 1    The claimant, Michael Toles, worked as a police officer for the employer, Bolingbrook Police Department. He injured his back while loading his duty bag into his personal vehicle in preparation for reporting to the police station for work. He filed a claim for benefits pursuant to the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2012)). The Commission found that the claimant sustained an

accidental injury arising out of and in the course of his employment. The Commission further found that the claimant established a causal relationship between the accident and the condition of ill-being in his low back requiring surgery. In light of these findings, the Commission awarded the claimant reasonable and necessary medical expenses, 5-2/7 weeks of temporary total disability (TTD) benefits, and 100 weeks of permanent partial disability (PPD) benefits. The employer appeals the Commission's finding that the claimant's injury arose out of and in the course of his employment. The employer also takes issue with the Commission's finding that the claimant's conditions of ill-being in his low back are causally related to the accident. We affirm.

¶ 2                                I. BACKGROUND

¶ 3     The claimant began working for the employer as a police officer in September 1995. The claimant testified that his job duties required him to wear an armored vest, a Kevlar helmet, and a duty belt that consisted of two pairs of handcuffs, a firearm, two firearm cartridges, a metal baton, and a taser. He injured his back on February 17, 2009, as he lifted his duty bag to place it in his personal vehicle prior to leaving his home for work. He testified that the duty bag weighed approximately 40 pounds and contained the equipment he uses as a police officer on patrol, including the Kevlar helmet, gas mask, vehicle and criminal codes, incident reports, extra ammunition, his handcuffs, and "a few other items." He described the incident as follows:

"That day I was getting ready to go to work. I put on my uniform, put on my coat, I was in my garage. I went to go pick up my duty bag, and I lifted it up and I turned to go put it in the trunk of the car and my back gave out on me."

He testified that he felt a sharp pain in his lower back. He had problems with his back prior to this incident, but he testified that this pain was different because it was incapacitating. He had to "hobble" back into his house bent over.

¶ 4    The claimant stated that he was required to keep the duty bag "with [his] person." The employer did not require him to take the duty bag home and did not require him to take it to the station at the end of his shift. However, the employer did not prohibit him from keeping the duty bag at his home. When asked why he was putting the duty bag in the trunk of his car, he responded:

"I kept it in the trunk because that way I didn't have to carry it all the way into the station. Tried to be as smart as possible. Drive the squad car to my car, take it out of the trunk of my personal car, take it up, set it down in the garage. It's typical. Most police officers would do that instead of having to carry their duty bags back and forth to their lockers because of the weight of it."

¶ 5    The claimant explained that he kept his duty bag in his garage at home "[t]o keep it safe." On cross-examination, he acknowledged that there was no requirement that he take his duty bag home after each shift but added that the employer did not have a policy prohibiting it either.

¶ 6                                         (1)

- 3 -

¶ 7                    The Claimant's Medical Treatments
                    for Low Back Conditions Prior to the Accident

¶ 8    The evidence in the record establishes that the claimant received medical treatments for low back pain before the February 17, 2009, incident.  The claimant testified that he experienced a sharp pain in his lower back at the end of his shift on November 21, 2008.  Before that incident, he had sciatica problems "from time to time" and had received chiropractic adjustments for a low back condition.

¶ 9    Medical records show that he periodically received chiropractic treatment from Dr. Carl Geipel between 2002 and 2009.  Dr. Geipel's records reflect that the claimant had a "severe low back condition" as early as July 2002.  Thereafter, he reported a variety of symptoms while treating with Dr. Geipel, including right-sided low back pain, right sciatic nerve complaints, sharp pain and tightness in his low back, and low back pain radiating to the right hip and lower extremity.   He testified that he never discussed back surgery with Dr. Geipel.

¶ 10   On November 26, 2008, he consulted with a spine surgeon, Dr. Nicholas Mataragas.  According to Dr. Mataragas, at that time, the claimant reported a history of low back and right leg pain for about a week without any contributing factor.  The claimant testified that he told Dr. Mataragas that he had been seeing a chiropractor for years and that he was experiencing increased pain.  Upon physical examination, straight-leg raising was positive on the right, which, according to Dr. Mataragas, was indicative of nerve compression in the claimant's spine.  Dr. Mataragas' impression was degenerative disc disease with radiculopathy.   Dr. Mataragas prescribed over-the-counter pain

medication, advised the claimant to modify his activities, and ordered an MRI. The MRI showed a disc herniation at L5-S1.

¶ 11 The claimant returned to Dr. Mataragas' office on December 5, 2008. At that time, he continued to complain of pain in his low back and right leg. He reported that he believed that his tool belt seemed to give him some back pain. Dr. Mataragas noted that, despite these symptoms, the claimant was "functionally quite well." Dr. Mataragas prescribed physical therapy and advised him that if, at the completion of therapy, he still had symptoms, epidural steroid injections would be considered. The claimant testified that the physical therapy provided some improvement, but he still experienced discomfort.

¶ 12 The claimant saw Dr. Mataragas on February 13, 2009. At that time, he was still symptomatic, so he and Dr. Mataragas discussed "[a]ll of [his] treatment options." The claimant testified that he believed that they talked about another round of physical therapy and possibly steroid treatments. He denied that he and Dr. Mataragas discussed surgery as an option on February 13, 2009. He testified that he was not a candidate for surgery at that time. Dr. Mataragas testified that they "probably discussed everything from *** epidural steroid injections to surgery." Dr. Mataragas' office note reflects that the claimant wanted to take some time to consider his options and would contact the doctor's office when he made "a decision regarding any further treatment." Dr. Mataragas testified that there was no specific recommendation for surgery at that time; they only discussed options.

¶ 13　A telephone log from the claimant's physical therapist states that he contacted her on February 13[1] and stated that he wanted to discontinue physical therapy due to surgery. The telephone log provides:

"[The claimant] called to inform us today was his last 'training' session. [The claimant] stated having seen [*sic*] MD today [and] *** has considered surgery.　[The claimant] stated [physical therapy] has worked but continues to have [pain] and 'tightness' the next day.　[The claimant] also said Doctor said he has signif [*sic*] nerve impingement [and] the 'next step is to remove cartilage to relieve pressure.'　[The claimant] reports the MD stated now that he has been in therapy for [about three months] the success rate of the surgery will ↓ *** due to the nerve impingement.　[The claimant] states the surgery will probably be within next 2 weeks [and] to [discontinue] therapy."

¶ 14　A February 18, 2009, discharge summary prepared by claimant's physical therapist states that claimant "saw his MD on 2/13/09" and "came into the clinic after MD appt. stating that he wanted to be D/C'd from PT due to possibly having surgery." At the

---

[1] The date on the physical therapist's telephone log is February 13, 2008. However, this appears to be a typographical error as there is no indication that the claimant was receiving physical therapy in February 2008.　Moreover, a prior message on the telephone log is dated January 24, 2009, and a February 13, 2009, date is consistent with a discharge summary prepared by the physical therapist.

arbitration hearing, the claimant denied telling the physical therapist before February 17 that he was discontinuing physical therapy in anticipation of surgery.

¶ 15 (2)

¶ 16 The Claimant's Medical Treatments After the Accident

¶ 17 After the accident, the claimant immediately called his supervisor to tell him that he injured his back and would not be coming into work. He then called Dr. Mataragas' office and told him that he hurt his back "pretty severe" and that he needed to see the doctor. The following day, he saw Dr. Mataragas and reported that his pain had become significantly worse after picking up a bag. The claimant testified that it was at that point that he discussed surgery with Dr. Mataragas and decided to have back surgery. Dr. Mataragas removed him from work. Prior to that time, no physician had ever removed him from work due to back problems.

¶ 18 The next day, February 19, 2009, the claimant underwent a bilateral laminectomy at L5-S1 with excision of herniated disc material under the direction of Dr. Mataragas. Dr. Mataragas noted that the operative findings showed a disc protrusion and some nerve compression, which was consistent with the claimant's symptoms. Following surgery, the claimant underwent physical therapy. He periodically worked light duty in March and April before Dr. Mataragas returned him to full duty on April 14, 2009.

¶ 19 (3)

¶ 20 Conflicting Medical Opinions on the issue of Causation

¶ 21    On March 22, 2010, Dr. G. Klaud Miller, an orthopaedic surgeon, examined the claimant at the employer's request and reviewed the claimant's medical records.    In his report dated March 28, 2010, Dr. Miller wrote that Dr. Mataragas clearly discussed surgery with the claimant on February 13, 2008, and that Dr. Mataragas stated that delay could compromise the results of the surgery.  He believed that the claimant was preparing for surgery before the February 17, 2009, accident involving the duty bag.  He opined that the claimant's low back surgery was inevitable based on his condition on February 13, 2008, and that the February 17, 2009, accident did not cause or accelerate the need for surgery.

¶ 22    Dr. Miller testified by evidence deposition that, in conjunction with the examination, he reviewed the records of Dr. Geipel and Dr. Mataragas, the report of the claimant's surgery, and the physical-therapy records.  Dr. Miller diagnosed the claimant with a herniated disc at L5-S1.  When asked about the cause of the herniated disc, Dr. Miller responded:

>    "I can't say because it—it probably was the same thing that caused it in 2002, probable—probably just happened.  There's no way for me to tell what caused it, but the symptoms were identical in 2008.  Probably just natural deterioration of whatever started in 2002.  Call it bad genes or bad luck or unknown or unidentified injury, I can't say."

¶ 23    Dr. Miller was also asked whether the claimant's act of lifting his duty bag on February 17, 2009, would have caused the need for back surgery.  In response, Dr. Miller

observed that surgery had been "discussed and recommended" before February 17, 2009. Moreover, in his opinion, there was no objective evidence of any change in the claimant's condition before or after the alleged accident and no evidence to suggest that there was any effect by the event of February 17.

¶ 24    On cross-examination, Dr. Miller explained that he reached his conclusion that the February 17, 2009, accident did not cause or accelerate the need for surgery based on not only the February 13, 2009, physical therapy note, but also the records of Dr. Mataragas, which discuss "treatment" on February 13, 2009.  He admitted that the notes do not specifically indicate that Dr. Mataragas discussed surgery as an option.  In addition, he admitted that the claimant reported "subjective improvement" in his low-back condition between December 2008 and February 13, 2009.  He also acknowledged that it is "possible" that an act of lifting as described by the claimant could cause an increase in pain in an individual with a preexisting back condition.  He also admitted that the increased pressure on the claimant's disc from lifting the duty bag could cause additional injuries or worsening of the disc condition.  Nevertheless, he indicated that, in his opinion, "this was an inevitable degeneration that had been going on for five years."  He further noted that the claimant had a diagnosis of a herniated disc prior to the February 17, 2009, event.  As such, he concluded that "the lifting incident had nothing to do with [the claimant's] need for surgery."  He agreed that because he cannot opine what caused the condition in the claimant's back, it was possible that the claimant's work caused it.

¶ 25   On re-direct examination, Dr. Miller noted that although Dr. Mataragas' office note of February 13, 2009, does not use the term "surgery," it states that he discussed "all of his treatment options." Dr. Miller testified that the treatment options for a herniated disc are nonoperative versus operative.  Since the claimant had already undergone nonoperative care, Dr. Miller presumed that Dr. Mataragas discussed surgery with the claimant on February 13, 2009.  Dr. Miller added that his presumption is supported by the physical therapy record of the same date, which references a surgical recommendation.

¶ 26   In response to a request from the claimant's attorney regarding causation, Dr. Mataragas authored a letter dated September 3, 2009.  In the letter, Dr. Mataragas opined as follows:

> "The incident of February 17, 2009 *** certainly could have aggravated [the claimant's] condition and most likely did as it increased his symptoms to the point where he required surgery.  Therefore, I would say within a reasonable degree of medical certainty that the incident of February 17, 2009, did in fact lead to his surgery as he was not symptomatic enough prior to that incident to require surgery."

¶ 27    In his evidence deposition, Dr. Mataragas reiterated that the claimant's act of lifting the duty bag on February 17, 2009, aggravated the preexisting condition of his spine leading to the need for surgery.  Dr. Mataragas explained:

> "Well, just based on his complaints.  If he wasn't having pain before and he had it immediately after, you know, you could surmise that the two events were

related. The mechanism of bending forward or down is a flexor—flexion moment [*sic*] which does increase pressure on the disc. That's the position in which disc injuries do occur, so it does make sense."

¶ 28 Dr. Mataragas further testified at his deposition that he probably discussed surgery with the claimant on February 13, 2009. However, he denied making any specific recommendation for surgery on that date. He stated that he never tells a patient whether he or she needs spine surgery. With respect to Dr. Miller's opinions, Dr. Mataragas testified that he thought Dr. Miller was "a bit confused in that whether or not I discuss surgery with a patient does not necessarily mean that patient will accept surgery are [sic] be a candidate for surgery." He added that Dr. Miller is not a spine surgeon and, therefore, was not familiar with what spine surgeons do on a daily basis.

¶ 29 He explained that most spine surgery is an elective surgery that is ultimately decided upon by the patient based on his or her complaints. Thus, Dr. Mataragas related, that he discussed surgery with the claimant on February 13, 2009, has nothing to do with whether he felt that the patient needed surgery at that time. The doctor believed that his discussion of surgery with the claimant on February 13, 2009, was "irrelevant," because the claimant did not deem himself to require surgery until after he had the lifting accident. In other words, according to Dr. Mataragas, although he and the claimant discussed surgery prior to February 17, 2009, "as an option," he did not believe that the claimant would be a candidate for surgery until the claimant accepted that option. The claimant did not accept surgery as an option until after the February 17, 2009, accident.

On cross-examination, Dr. Mataragas agreed that if the claimant had decided upon surgery prior to February 17, 2009, he would have been ready to perform the surgery.

¶ 30                                        (4)

¶ 31                          Proceedings Below

¶ 32    Based on the foregoing evidence, the arbitrator determined that the claimant sustained accidental injuries that arose out of and in the course of his employment with the employer on February 17, 2009.   In support of this finding, the arbitrator acknowledged that the accident occurred while the claimant was at home but reasoned that the claimant was "specifically engaged in an activity performed for the benefit of [the employer], an activity [the employer] could reasonably expect [the claimant] to perform.  [The claimant's] testimony that the duty bags were to be kept with officers for safekeeping even while off duty was not contradicted."  The arbitrator also pointed out that, as a police officer, the claimant would be considered to be on-call 24 hours a day. Additionally, the arbitrator concluded that the claimant established that the condition of ill-being of his low back requiring surgery is causally related to the February 17 accident. The arbitrator awarded the claimant reasonable and necessary medical expenses (820 ILCS 305/8(a), 8.2 (West 2008)) and 5-2/7 weeks of TTD benefits (820 ILCS 305/8(b) (West 2008)).   Further, the arbitrator, concluding that the claimant's condition had stabilized, awarded him 100 weeks of PPD benefits (representing 20% loss of a person as a whole) (820 ILCS 305/8(d)(2) (West 2008)).  The Commission summarily affirmed and

adopted the arbitrator's decision. On judicial review, the circuit court of Will County confirmed the Commission's decision. This timely appeal followed.

¶ 33                                                    II. ANALYSIS

¶ 34    On appeal, the employer challenges the Commission's award of benefits on two grounds. First, the employer contends that the Commission's finding that the claimant sustained an accidental injury arising out of and in the course of his employment on February 17, 2009, is contrary to law and against the manifest weight of the evidence. Second, the employer argues that the Commission's finding that there is a causal relationship between the alleged accident of February 17, 2009, and the claimant's condition of ill-being in his low back is against the manifest weight of the evidence. We disagree with both of the employer's arguments.

¶ 35                                                    (1)

¶ 36                        Arising out of and in the course of employment

¶ 37    An employee's injury is compensable under the Act only if it "arises out of" and "in the course of" the employment. 820 ILCS 305/2 (West 2008). The employee bears the burden of proving by a preponderance of the evidence both of these elements. *Baldwin v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 472, 477, 949 N.E.2d 1151, 1156 (2011). The "in the course of" element refers to the time, place and circumstances under which the accident occurred. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 57, 541 N.E.2d 665, 667 (1989). The "arising out of" element requires that an injury's origin "must be in some risk connected with, or incidental to, the

- 13 -

employment so as to create a causal connection between the employment and the accidental injury." *Id*. at 58, 541 N.E.2d at 667. "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Id*.

¶ 38    As a general rule, the question of whether an employee's injury arose out of and in the course of his employment is one of fact for the Commission. *Brais v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 120820WC, ¶ 19, 10 N.E.3d 403. With respect to factual matters, it is within the province of the Commission to judge the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences therefrom. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674, 928 N.E.2d 474, 482 (2009). We will not overturn the Commission's determination on a factual matter unless it is against the manifest weight of the evidence. *Mlynarczyk v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120411WC, ¶ 15, 999 N.E.2d 711. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Will County Forest Preserve District v. Illinois Workers' Compensation Comm'n,* 2012 IL App (3d) 110077WC, ¶ 15, 970 N.E.2d 16. In the present case, the Commission's finding that the claimant's injury arose out of and in the course of his employment is not against the manifest weight of the evidence.

¶ 39    Testimony in the record establishes that the claimant's duty bag contained gear and equipment that were necessary for the performance of his duties as a police officer. The

40-pound bag included a Kevlar helmet, gas mask, vehicle code, criminal code, incident reports, extra ammunition, handcuffs, flashlight, and other items necessary for his duties as a police officer. He was injured while lifting this equipment in preparation for work.

¶ 40 On appeal, the employer emphasizes that the claimant was not required to take his duty bag home and because the accident occurred at his home, it did not arise out of and in the course of his employment. We disagree.

¶ 41 The evidence in the record supports a finding that, as part of his job duties, the claimant was responsible for the safekeeping of his duty bag. He testified that the employer required him to keep the duty bag with his person, presumably while on patrol. The evidence in the record also supports a finding that, at the end of his shift, the employer allowed him at least two options with respect to the job-related task of safekeeping the duty bag: securing the bag in lockers at the police station or securing the bag at his personal residence. Both options were apparently acceptable to the employer as many officers took their duty bags home at the end of their shifts, and the employer had no rule prohibiting the safekeeping of duty bags at officers' personal residences. Therefore, regardless of which of the two options the claimant chose at the end of any given shift, the Commission could find that the responsibility for the safekeeping of the duty bag remained a job-related undertaking.

¶ 42 Because safekeeping the duty bag at home was acceptable to the employer, it does not matter whether the claimant injured his back while loading his duty bag into a personal vehicle or loading the bag into or retrieving the bag out of a locker at the station.

The evidence supports a finding that both scenarios entail identical tasks that are incidental to the claimant's job-related responsibility of keeping his duty bag secure. Because the employer allowed its officers to secure their duty bags at their personal residences, the employer could reasonably expect its officers to perform the tasks necessary for securing duty bags at their personal residences; the employer would know that the claimant needed to move the duty bag in his garage for loading and unloading the bag from its secure storage. Accordingly, in the present case, the claimant's election to secure his duty bag in his garage, instead of a locker at the station, does not remove his injury from the realm of compensable injuries. "Injuries sustained at a place where a claimant might reasonably have been while performing his work duties are deemed to have been received in the course of his employment." *Nee v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 132609WC, ¶ 20, 28 N.E.23d 961.

¶ 43    As noted above, to be compensable, an injury must also occur while the officer is engaged in an activity that is incidental to his position. *Siens v. Industrial Comm'n¸* 84 Ill. 2d 361, 364, 418 N.E.2d 749, 750 (1981). An activity is incidental to the employment if it carries out the employer's purposes or advances its interests, either directly or indirectly. *Sears, Roebuck & Co. v. Industrial Comm'n*, 79 Ill. 2d 59, 71-72, 402 N.E.2d 231, 237 (1980). The employer argues that the only conclusion that the record supports is that the claimant's "actions of lifting his duty bag were personal in nature and not an activity performed for the benefit of the [e]mployer." We disagree.

¶ 44 In the present case, the evidence supports a finding by the Commission that the claimant's duties related to the safekeeping of his duty bag directly furthered the employer's interests. We believe that the direct benefit to the employer when an officer performs tasks that are necessary for the safekeeping of his duty bag is substantial and self-evident. Law enforcement duty bags containing live ammunition, and other law enforcement equipment, left unattended in the community or otherwise lost or unaccounted for in the community, have the potential of posing a hazard to public safety as well as presenting an unprofessional image, undermining the public's confidence in law enforcement. The employer has a direct interest in seeing that its officers maintain the safekeeping of the equipment that is necessary for their duties on patrol. The claimant was injured while performing actions that were directly related to this job-related task.

¶ 45 The claimant testified that the employer required him to keep his duty bag "with [his] person." Arguably, this directive might apply only while the officers are on patrol because they were not required to carry their duty bags while off duty. However, it does not take much of an inference for the Commission to conclude that the employer's direct interest in its police officers' duty bags does not terminate at the end of their shifts but also encompasses the safekeeping of their bags in between their shifts. The claimant testified that he kept his duty bag in his garage "[t]o keep it safe."

¶ 46 Therefore, the evidence in the record supports a finding that the employer's interests are furthered when its officers perform tasks before and after their shifts that are

directly related to the safekeeping of their duty bags. These safekeeping tasks include lifting the 40-pound bags from their secure locations in preparation for assigned duties. The claimant in the present case sustained his injury performing this lifting task. The Commission was well within its prerogative in finding that the claimant was "specifically engaged in an activity for the benefit of [the employer], an activity the [employer] could reasonably expect [the claimant] to perform." Under the manifest weight of the evidence standard, we cannot reverse this finding.

¶ 47                                                    (2)

¶ 48            Causal Connection Between the Accident and Conditions of Ill-Being

¶ 49    The employer also challenges the Commission's finding that the claimant established a causal connection between the accident and the conditions of ill-being in his low back. The record contains conflicting medical evidence on this issue. It is well settled that the Commission has the responsibility of resolving conflicts within the evidence, particularly medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221, 223-24 (1980). Under the facts of this case, we cannot second-guess the Commission's resolution of the conflicting medical evidence on the issue of causation.

¶ 50    In a proceeding under the Act, the employee has the burden of proving, by a preponderance of the evidence, all of the elements of his or her claim. *Id.* at 253, 403 N.E.2d at 223. Among other things, the employee must establish that his or her condition of ill-being is causally connected to a work-related injury. *Elgin Board of Education*

*School District U-46 v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 943, 948-49, 949 N.E.2d 198, 203 (2011). In cases involving a preexisting condition, recovery will depend on the employee's ability to establish that a work-related accidental injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally connected to the work-related injury. *Id.* at 949, 949 N.E.2d at 204.

¶ 51 Under the Act, the accidental injury need not be the sole causative factor, or even the primary causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 434, 943 N.E.2d 153, 160 (2011). "Thus, even though an employee has a preexisting condition that may make him or her more vulnerable to injury, recovery will not be denied where the employee can show that a work-related condition aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally related to conditions in the workplace and not merely the result of a normal degenerative process of the preexisting condition." *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 596-97, 840 N.E.2d 300, 312 (2005).

¶ 52 Whether a causal connection exists between an employee's condition of ill-being and his or her employment is a question of fact for the Commission. *Id.* at 597, 840 N.E.2d at 312. It is the function of the Commission to assess the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny*, 397 Ill. App. 3d at 674, 928

N.E.2d at 482. The Commission's factual findings will not be disturbed on review unless they are against the manifest weight of the evidence. *Ming Auto Body/Ming of Decatur, Inc. v. Industrial Comm'n*, 387 Ill. App. 3d 244, 257, 899 N.E.2d 365, 378 (2008). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Will County Forest Preserve District,* 2012 IL App (3d) 110077WC, ¶ 15, 970 N.E.2d 16.

¶ 53    In finding a causal relationship between the claimant's employment and the condition of ill-being in his low back, the Commission affirmed and adopted the arbitrator's decision. The arbitrator, in turn, was persuaded by the medical opinions and testimony of the claimant's treating physician, Dr. Mataragas. Dr. Mataragas opined that the claimant's act of lifting his duty bag aggravated or accelerated the preexisting condition in his low back, leading to his back surgery. The evidence supports Dr. Mataragas's opinion that the claimant's preexisting condition worsened after the work-related accident.

¶ 54    Before the accident, Dr. Mataragas diagnosed the claimant with degenerative disc disease with radiculopathy and ordered an MRI. The MRI showed a disc herniation at L5-S1. Thereafter, Dr. Mataragas treated the claimant conservatively with medication and physical therapy. When the claimant saw Dr. Mataragas on December 5, 2008, the doctor noted that he was "functionally quite well." The claimant testified that the physical therapy prescribed by Dr. Mataragas provided him with some improvement. When the claimant saw Dr. Mataragas on February 13, 2009, they discussed further

treatment options. There is a conflict in the record concerning whether they specifically discussed back surgery as an option. Regardless, it is undisputed that back surgery was not prescribed at that time. The employer's own expert, Dr. Miller, admitted during his testimony that the claimant reported subjective improvement before the accident.

¶ 55    The claimant described the work-related accident and testified that the back pain he experienced from the accident was different from any previous back pain he had experienced because the new pain was incapacitating. Dr. Miller admitted that it was possible that the act of lifting the 40-pound duty bag could cause an increase in pain in an individual with a preexisting back condition. He admitted that the increased pressure on the claimant's disc from lifting the duty bag could cause additional injuries or worsening of the claimant's disc condition. Likewise, Dr. Mataragas opined that the mechanism of bending forward is a flexion movement "which does increase pressure on the disc." He concluded that, within a reasonable degree of medical certainty, "the incident of February 17, 2009, did in fact lead to [the claimant's] surgery as he was not symptomatic enough prior to that incident to require a surgery."

¶ 56    Based on this evidence, the Commission was well within its prerogative to find that the claimant's work-related accident aggravated or accelerated his preexisting back condition and was a causative factor resulting in his back surgery. The evidence relevant to the issue of causation was conflicting, and it is not clearly apparent in the record that the Commission's finding was incorrect. Therefore, we cannot reverse the Commission's causation finding under the manifest weight of the evidence standard.

¶ 57                                    III.  CONCLUSION

¶ 58    For the reasons set forth above, we affirm the judgment of the circuit court of Will County, which confirmed the decision of the Commission awarding claimant benefits under the Act.

¶ 59    Affirmed.

¶ 60    JUSTICE HUDSON, dissenting:

¶ 61    I respectfully dissent from the majority opinion.  I would find that claimant failed to sustain his burden of showing that the injury for which he seeks workers' compensation benefits occurred "in the course of" his employment with respondent. Accordingly, I would reverse the judgment of the circuit court, which confirmed the decision of the Commission.

¶ 62    Entitlement to benefits under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2008)) requires an employee to establish by a preponderance of the evidence not only that his or her injury "arose out of" the employment but also that the injury occurred "in the course of" the employment.  820 ILCS 305/2 (West 2008); *University of Illinois v. Industrial Comm'n*, 365 Ill. App. 3d 906, 910 (2006); *O'Fallon School District No. 90 v. Industrial Comm'n*, 313 Ill. App. 3d 413, 416 (2000).  The determination of whether an injury arose out of and in the course of one's employment is a question of fact for the Commission to resolve, and its finding in that regard will not be set aside on review unless it is against the manifest weight of the evidence.  *Adcock v. Illinois Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC, ¶ 29.  A decision is

against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Will County Forest Preserve District v. Illinois Workers' Compensation Comm'n,* 2012 IL App (3d) 110077WC, ¶ 15. Although this court is reluctant to conclude that a factual determination of the Commission is against the manifest weight of the evidence, we will not hesitate to do so when the clearly evident, plain, and undisputable weight of the evidence compels an opposite conclusion. *Dye v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 10. I find this to be such a case.

¶ 63　The phrase "in the course of" refers to the time, place, and circumstances of the injury. *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 149, 162 (2000). Injuries sustained on an employer's premises, or at a place where the employee might reasonably have been while performing his duties, and while the employee is at work, are generally deemed to have been received in the course of the employment. *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1013-14 (2011). At the time of the alleged injury in the present case, claimant was employed as a police officer. He alleged that he injured his back as he was placing his duty bag in the trunk of his personal vehicle prior to leaving his home for work. Thus, the alleged injury did not occur on respondent's premises or at a place where claimant was reasonably expected to be in the performance of his duties. See *Mills v. Industrial Comm'n*, 27 Ill. 2d 441, 444 (1963) (holding that injury occurring outside regular work hours does not occur within the time

period of the employment); *Curtis v. Industrial Comm'n*, 158 Ill. App. 3d 344, 350 (1987) (concluding that injuries sustained by truck driver during his lunch period at his employer's "wash rack" did not occur at a place where the employee reasonably would be in the performance of his duties).

¶ 64 The Commission, in affirming and adopting the decision of the arbitrator, acknowledged that the accident occurred while claimant was at home, but reasoned that claimant was "specifically engaged in an activity performed for the benefit of Respondent, an activity the Respondent could reasonably expect [claimant] to perform." The Commission further explained that "[claimant's] testimony that the duty bags were to be kept with officers for safekeeping even while off duty was not contradicted." I disagree with these findings by the Commission. First, there was no evidence regarding how claimant's decision to bring his duty bag home after each shift benefitted respondent. In fact, claimant expressly acknowledged that he was *not* required to bring his duty bag home and that respondent provided a locker at the police station for each officer to store his or her equipment. Nevertheless, claimant elected to take the duty bag home so that he would not have to carry it back and forth from his locker at the beginning and end of each shift. In other words, the evidence of record clearly establishes that it was claimant's own decision to take his duty bag home after each shift and that he did so for his own convenience, not for the benefit of respondent. See *O'Neil v. City of Albany Police Department*, 916 N.Y.S. 2d 313 (N.Y. App. Div. 2011) (denying benefits to police officer injured prior to the start of her shift as she was retrieving from her personal

vehicle a bag containing both personal and work-related items where employer provided a locker to store such items but the officer elected to keep them in her car while off duty).

¶ 65 Second, contrary to the Commission's finding, claimant's testimony that the duty bags were to be kept with officers for safekeeping even while off duty *was* contradicted. Initially, claimant did state that he was required to keep the duty bag "with [his] person." However, he later indicated that he was not required to bring his duty bag home and that respondent provided a locker at the police station for each officer to store his or her equipment. Moreover, claimant did not keep his duty bag with him at all times. In this regard, claimant testified that he kept the duty bag in his garage while not on duty. If respondent provided a locker for its officers to store their equipment and if respondent personally kept his duty bag in his garage, he was clearly not required to keep his duty bag with him at all times. At most, claimant's testimony establishes that officers were required to keep their duty bags with them during their work shifts.

¶ 66 Despite the foregoing evidence, the majority finds that claimant was responsible for the safekeeping of his duty bag and that this task furthered respondent's interests. *Supra* ¶¶ 41, 44. Noting that respondent had no rule prohibiting an officer from keeping a duty bag at his or her personal residence, the majority posits that respondent allowed claimant "two options with respect to the job-related task of safekeeping the duty bag: securing the bag in the lockers at the police station or securing the bag at his personal residence." *Supra* ¶ 41. The majority then notes that each duty bag contains potentially dangerous items which, if lost or left unattended in the community, "have the potential of

posing a hazard to public safety as well as presenting an unprofessional image, undermining the public's confidence in law enforcement." *Supra* ¶ 44. I submit that the foregoing concerns are precisely why respondent provides each officer with a locker at the police station to store equipment. Indeed, it is unclear to me how the garage of claimant's personal residence constitutes a more secure location for such items than a locker at the police station. Moreover, while claimant testified that there was no policy prohibiting officers from taking home their duty bags for safekeeping, there was no evidence that respondent approved of this practice or that it was even aware that such a practice was common among its officers.

¶ 67   The Commission also pointed out that, as a police officer, claimant would be considered on-call 24 hours a day. However, claimant presented no evidence that he was always on call. See *County of Peoria v. Industrial Comm'n*, 31 Ill. 2d 562, 563 (1964) (where evidence was presented that the employee, a deputy sheriff, was considered "on call" 24 hours a day). Moreover, even if we assume that claimant was always on call, it does not necessarily follow that the injury occurred in the course of employment. *Siens v. Industrial Comm'n*, 84 Ill. 2d 361, 364 (1981). To be compensable, the injury must occur while the officer is engaged in an activity that is incidental to his position. *Siens*, 84 Ill. 2d at 364; 2 Arthur Larson, Larson's Workers' Compensation Law § 20, at 20-1 (2010). An activity is incidental to the employment if it carries out the employer's purposes or advances its interests, either directly or indirectly. 2 Arthur Larson, Larson's Workers' Compensation Law § 20, at 20-1 (2010); see also *Bertoch v. NBD Corp.*, 813

N.E. 2d 1159, 1161 (Ind. 2004) ("An action that directly or indirectly advances an employer's interest or is for the mutual benefit of the employer and employee may be incidental to and arise in the course of employment."). As noted above, claimant expressly testified that he was not required to take his duty bag home and he could have left it in his locker at the police station. Nevertheless, claimant elected to take his duty bag home simply because he did not want to bear the burden of transporting his bag to and from his locker at work to his squad car. Under these circumstances, I cannot find that the act in which claimant was engaged at the time of his alleged injury—placing his duty bag in the trunk of his personal vehicle prior to leaving his home for work— advanced respondent's interests, either directly or indirectly. Consequently, the act of transferring the duty bag from claimant's garage to his personal vehicle prior to the start of his work shift was not incidental to claimant's employment as a police officer.

¶ 68    Finally, I believe that the majority's opinion could have far-reaching and unintended consequences. Conceivably, under the majority's reasoning, any employer who does not institute a policy expressly prohibiting an employee from taking home work-related equipment could potentially be liable for injuries occurring at the employee's residence while the employee is loading and unloading the equipment even if the purpose for taking the equipment is unrelated to the employment. In essence, the holding espoused by the majority imposes a duty upon the employer to monitor the comings and goings of its employees. I do not believe that the scope of the Act was intended to be so broad. In light of the foregoing, I must therefore dissent.

¶ 69    JUSTICE HARRIS joins in this dissent.