No. 2-17-0263WC
Opinion filed March 8, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division

| | | |
|---|---|---|
| DEBRA M. RECHENBERG, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Appellee, | ) | |
| | ) | |
| v. | ) | No. 16-MR-205 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | |
| | ) | Honorable |
| (Centegra Memorial Medical Center, | ) | Michael T. Caldwell, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1    On February 27, 2014, claimant, Debra M. Rechenberg, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2012)), seeking benefits from the employer, Centegra Memorial Medical Center. Following a hearing, the arbitrator determined claimant sustained an injury to her right shoulder that arose out of and in the course of her employment and awarded her (1) $34^3/_7$ weeks' temporary total disability (TTD) benefits and (2) $57,865.25 in medical expenses. On review, the Illinois Workers' Compensation Commission (Commission) reversed the arbitrator's decision,

finding claimant "failed to prove she sustained an accident arising out of and in the course of her employment *** or that her current condition of ill-being [was] casually related to her employment." On judicial review, the circuit court of McHenry County reversed the Commission's decision, finding it was against the manifest weight of the evidence. It ordered that the arbitrator's decision be reinstated. The employer appeals, arguing the Commission's determination that claimant failed to prove a compensable, work-related injury was not against the manifest weight of the evidence. We reverse the circuit court's judgment and reinstate the Commission's decision.

¶ 2                                    I. BACKGROUND

¶ 3      On January 27, 2015, the arbitration hearing was conducted. Claimant testified she was a registered nurse and had worked as a nurse for over 25 years. For approximately 10 of those years, she worked for the employer. In February 2006, claimant was hired by the employer on a part-time basis. She testified she was a floor nurse on a medical/surgical unit that dealt with "a lot of abdominal surgeries." Claimant cared for individuals undergoing gastric bypass surgery, diabetic patients, and patients going through detox. She described her job as being very physical and requiring her to "do a lot of movement" of patients. As a part-time employee, claimant worked two to three days per week. She typically worked 8-hour shifts but was asked to work 12-hour shifts on occasion.

¶ 4      Claimant alleged she suffered a work-related injury to her right shoulder on January 18, 2014. However, she also acknowledged that, in December 2013, approximately one month before her alleged work injury, she was involved in an accident at home that affected her right shoulder. Claimant described that accident as follows: "I was walking down the basement stairs and I misstepped one step and landed straight down on my butt. And my feet were on the floor of

the ground and I bumped my right shoulder." Claimant denied falling down the entire flight of stairs but acknowledged feeling pain in her buttocks and soreness in her shoulder as a result of the incident.

¶ 5     Claimant described feeling "a little twinge" in her right arm or shoulder at the time she fell, as well as pain on the side of her right arm and "generalized achiness" in her right shoulder. She did not immediately seek medical care for her symptoms, but she did schedule a doctor's appointment at the encouragement of her son, a physical therapist. Claimant stated, in the meantime, she continued working for the employer as a floor nurse with no problems or work restrictions. On cross-examination, claimant testified her fall at home occurred on approximately December 18, 2013. Further, she agreed to working on three specific dates after her December 2013 fall at home and prior to her January 18, 2014, alleged work accident. Specifically, she testified she worked on December 22, 2013, from 6:55 a.m. to 4:30 p.m.; for eight hours on December 25, 2013; and for eight hours on December 28, 2013. Claimant's testimony also indicated there were additional days when she was scheduled to work but there was a "low census" and she was "put on call." During those times, claimant would get paid "to sit at home and wait for a call."

¶ 6     At arbitration, the employer submitted a "wage statement" for claimant into evidence. The wage statement showed that from December 8, 2013, to December 21, 2013, claimant was paid by the employer for a total of 40.75 hours. From December 22, 2013, to January 4, 2014, she was paid for a total of 43.5 hours.

¶ 7     On January 18, 2014, claimant worked a 12-hour shift for the employer, which began at 7 a.m. She estimated she was assigned five or six patients, whom she assisted by positioning and repositioning them in bed and helping them to the toilet. Claimant recalled caring for one patient

in particular who was obese and weighed approximately 250 pounds. Several times during the day, she was required to reposition that patient in bed. Claimant stated "the morning was not a problem"; however, when adjusting the patient in bed in the afternoon, claimant felt "a deep stabbing, like pinpointing type of pain" in her right shoulder. She further described that incident as follows:

> "[The patient] wanted me to boost her or adjust her one more time, and it was just the one motion, and I just felt like—like an 'oh my, shit,' or like 'oh, my gosh, what did I do to my—what did I do to my arm?' It was like, 'Oh boy, oh boy, oh boy.' "

Claimant denied feeling that same type of pain earlier in the day or previously having any trouble readjusting any of her patients.

¶ 8        Claimant stated she finished her shift "in tears" and felt pain as she continued to lift her patients. She described the pain as constant and "always there" but stated it was not as sharp or intense as it had been and that it was different from "that first 'Oh, my gosh,' pain." Claimant testified she reported her injury to both the charge nurse and her supervisor.

¶ 9        According to claimant, she also worked the next day, January 19, 2014, and continued to have constant soreness in her arm. She stated she tried to "call in sick" but did end up working. Claimant asserted she was in "constant pain" while working and her arm "throbbed with any activity." She also testified that she filled out an injury report form on January 19, 2014, at the request of her supervisor, Karen Orlando. She identified a copy of that form, which was submitted at arbitration. Claimant testified the top half of the form was in her own handwriting. On the form, she described an injury to her right shoulder/biceps muscle that occurred "mid afternoon" on Saturday, January 18, 2014. Further, she reported the injury occurred due to "repeativly [*sic*]/frequently repositioning pt in bed." At arbitration, claimant agreed the injury

report made no mention of experiencing an "oh wow" or "oh boy" moment. After working on January 19, 2014, claimant did not believe she could safely perform her job duties because she did not feel safe moving patients. She reiterated that she did not have any trouble or difficulty caring for patients prior to January 18, 2014.

¶ 10    Following her alleged work accident, claimant first sought medical treatment on January 20, 2014, with the office of Dr. Rolando Izquierdo, an orthopedic surgeon. Claimant acknowledged her appointment with that office had been scheduled prior to her alleged work accident. Specifically, she acknowledged that on January 15, 2014, she called Dr. Izquierdo's office to schedule an appointment because her shoulder was "sore on and off, like a muscle soreness, like when you work-out."

¶ 11    At the appointment, claimant saw Alicia Heuser, Dr. Izquierdo's physician's assistant. Claimant's medical records reflect she complained of right shoulder pain that had been present since December 2013 when she "fell down the stairs in her home." Claimant reported the pain had been "significantly worse" since working as a registered nurse for the employer. She stated her pain was at the top of her shoulder and described her pain as dull and occasionally stabbing. Heuser noted that claimant reported that the pain occurred "at all times" and made it difficult for her to sleep at night. Her symptoms were reportedly "worse with brushing teeth and reaching behind." Additionally, Heuser noted as follows:

"Work Injury:

Employer: Centegra Woodstock. [Claimant] noted the injury was witnessed by a tech repetitive all day long with the same patient. [Claimant] did seek medical care with Dr. Izquierdo. Date and time of injury: [January 18, 2014,] repetitive all day long. *** What were you doing when the accident occurred: repetitively moving a patient all day

long with the assistance of a tech. How did the accident occur: repetitively boosting a patient in bed with the assistance of a tech."

¶ 12    Following an examination and X-rays, Heuser assessed claimant as having a "[d]isorder of bursae and tendons in [her] shoulder region." She also recommended a magnetic resonance imaging (MRI) scan of claimant's right shoulder "due to the traumatic nature of the initial injury." Finally, claimant was given work restrictions of no overhead lifting and no lifting more than two pounds with her right arm.

¶ 13    On January 23, 2014, claimant underwent the right shoulder MRI. The MRI report set forth the following findings:

> "1. There are small full-thickness tears of the supraspinatus tendon.
>
> 2. There is severe tendinopathy of the infraspinatus tendon.
>
> 3. Small shoulder joint effusion and subacromial/subdeltoid bursal effusion.
>
> 4. Moderate osteoarthritis of the acromioclavicular joint."

¶ 14    On February 3, 2014, claimant saw Dr. Izquierdo for the first time. His medical records reflect claimant complained of right shoulder pain and noted that the date of her injury was "December 2013 when she fell down the stairs at home." Dr. Izquierdo reviewed the MRI of claimant's right shoulder and diagnosed her with "[d]isorder of bursae and tendons in shoulder region" and a "[h]igh grade partial thickness supraspinatus tear." Further, his office note contained the following opinion: "I do believe that all of their symptoms are directly related to the industrial injury they sustained on 1-18-14 while working for [the employer] as a Nurse." Ultimately, Dr. Izquierdo recommended surgery for claimant and provided her with work restrictions of no lifting more than two pounds, no overhead lifting, and no repetitive pushing or

pulling. Claimant testified the employer could not accommodate her modified-duty work restrictions.

¶ 15    On March 11, 2014, Dr. Izquierdo performed surgery on claimant in the form of a right shoulder arthroscopic rotator cuff repair, mini-open subpectoral biceps tenodesis, arthroscopic extensive debridement of the glenohumeral joint, arthroscopic subacromial decompression with anterior acromioplasty. After surgery, he prescribed the use of a sling and a course of physical therapy. During a follow-up visit on April 21, 2014, Dr. Izquierdo recommended continued physical therapy but found claimant could stop using the sling. Further, he found claimant could return to light-duty work if available.

¶ 16    Claimant testified that during physical therapy, she hit a plateau and her range of motion was not improving. During a follow-up visit, on May 19, 2014, Dr. Izquierdo noted claimant was doing slightly better than her last visit and but had complaints of pain and stiffness. He recommended continued physical therapy and that claimant start a "CPM chair" to help with her range of motion. On July 14, 2014, he gave claimant an injection in the glenohumeral joint of her right shoulder. On October 16, 2014, claimant saw Dr. Izquierdo for the last time and he released her to return to full-duty work with no restrictions. Claimant testified she did not return to work for the employer, however, because her "job was terminated."

¶ 17    At arbitration, a letter authored by Dr. Izquierdo on October 27, 2014, was submitted into evidence by the employer. In the letter, Dr. Izquierdo answered specific questions posed to him by claimant's counsel regarding her condition. The letter stated as follows:

> "3. Did the work injury of January 18, 2014[,] while continuously lifting and readjusting a patient at work cause or contribute to [claimant's] condition of ill being?

Answer: The difficulty here is that [claimant] reported a fall in December of 2013 *** and subsequently then reported a worsening of symptoms while lifting a patient in the hospital on January 18, 2014. Certainly, if she would have had a partial thickness rotator cuff tear or a partial injury to the tendon, could she have aggravated it or completed it while boosting a patient repeatedly over an entire shift? It is a possibility, although certainly not definitive.

4. Based on your opinion, do you believe that the work injury she sustained on January 18, 2014[,] caused her condition which required surgical intervention?

Answer: Again, this is difficult. [Claimant] sustained a fall in December, which was documented in the medical history. She then reports worsening of symptoms in January. It is very difficult to know whether she would have required surgical intervention regardless of aggravating the shoulder at work or if she worsened the condition at work. It is certainly plausible to consider that if she had a partial injury to the rotator cuff or a small tear, that she gradually made it larger through repetitive hoisting of a patient and lifting of a patient, although it is very difficult to confirm this, as well.

5. Is the mechanism of injury she reported on January 18, 2014[,] of lifting and re-adjusting the patient consistently over a work shift consistent with her biceps tendon pathology and rotator cuff tear?

Answer: As a 52-year-old female, her tissue and bone quality is very reasonable. It would be very difficult to just repetitively cause that type of pathology over a 12[-]hour shift. Now, if she had a small rotator cuff tear or a high grade partial thickness rotator cuff tear, could she have completed that while hoisting and lifting the patient? The answer is yes, possibly, however in my opinion, she probably would have a moment in

time while she was lifting that the pain got worse and that needs to be delineated from the patient.

6. Is *** your opinion [that claimant's] condition of *** ill being was caused by her work injury based on the fact that she was working full duty without restrictions up until the work injury and has been unable to work as a floor nurse since then?

Answer: The difficulty here is the history. [Claimant] reports two specific traumatic events or difficulties; one which was the fall down the stairs, which is a higher energy injury, and the second which is a repetitive insult over a 12[-]hour shift. I cannot give you an answer. My opinion is that ***, unless there is one moment or a specific point in time where she felt pain worse than others, where there is an acute injury, it is unlikely that she were to tear her rotator cuff completely just moving a patient over a 12 hour shift because of repetitive issues.

However, if she were to have already had a rotator cuff tear, could she have worsened that by lifting a patient? The answer is yes. In theory, she could have gradually propagated the tear and made it slightly larger, or in fact completed a high grade partial thickness tear. *** Certainly, this is not a clear cut case and more detail[s] from [claimant] regarding the type of injury that she sustained while moving that patient are necessary."

¶ 18 At arbitration, claimant submitted Dr. Izquierdo's deposition into evidence. The deposition was taken November 11, 2014, with claimant in attendance. Dr. Izquierdo testified he was an orthopedic surgeon and that he concentrated his practice on shoulder injuries. He described his treatment of claimant, stating he reviewed both claimant's MRI films and the MRI report. He determined claimant had a "high grade partial thickness rotator cuff tear of the

supraspinatus tendon without retraction," which he described as "essentially, a near complete tear of the supraspinatus tendon."

¶ 19    Dr. Izquierdo acknowledged rendering an opinion on February 3, 2014, which causally related claimant's symptoms to her work injury. He testified he based that opinion on claimant's report of symptoms that worsened after working. Dr. Izquierdo also testified as follows regarding the issue of causal connection:

> "So the [question] is—is did she tear her rotator cuff while moving a patient or did she tear her rotator cuff at the—at the fall in December of 2013, and the answer is I—I can't answer that, all right, no—nobody knows. What I do know is that she was working full-time, she went to lift a patient, and her symptoms got worse. So could she have already had a tear that she aggravated *** that made her symptomatic enough to seek treatment, the answer is yes. Could she have torn her rotator cuff at the time of the fall, yes. But again, she was asymptomatic enough to be able to work ***, and I don't have documentation of the specific injury, but following a specific work day, she reported to be unable to work anymore. And from that standpoint, could she have worsened the tear, the answer is yes, although I—I can't—without having a pre-MRI and a post-MRI, there's not [*sic*] way to answer that."

On examination by claimant's counsel, Dr. Izquierdo agreed that claimant's work on January 18, 2014, "could have been a cause" of her right shoulder injury.

¶ 20    On examination by the employer's counsel, Dr. Izquierdo acknowledged that a fall down stairs "on an outstretched arm" was a typical cause of a rotator cuff tear. He stated other causes for such an injury were falls, motor vehicle accidents, or a "lifting event." He described a lifting event as occurring when a person tried to lift something that overpowered the person's ability.

Dr. Izquierdo asserted that the lifting did not necessarily have to be above shoulder level and could include anything "that would require you to drive your arms upward." He stated that, depending on arm position, "anything from below, pulling up could certainly" cause a rotator cuff tear."

¶ 21    Dr. Izquierdo agreed that claimant's fall in December 2013 could have caused her rotator cuff tear. Further, he acknowledged that he did not know when claimant returned to work after her December 2013 fall. Also, the following colloquy occurred between the employer's counsel and Dr. Izquierdo:

"Q. Now you indicated just a few minutes ago that lifting could cause a rotator cuff tear if there is an overload of the rotator cuff, is that correct?

A. Correct. So if you have a moment in time when there's a specific injury while lifting, absolutely, that could be a cause for a rotator cuff tear.

\* \* \*

Q. But it has to be of a significant load, is that correct?

A. Correct. So and—and not just a significant load, most people would recognize a moment in time when they went to lift something, and they would feel—they would feel a—a sharp pain or an immediate symptom.

Q. Okay. And in your history from your patient, did she give you a history of a sharp pain or symptom while doing this activity[?]

A. I don't have any—I have a repetitive lifting issue, so in that—and I think that's one of—one of the difficulties in this, right, is that we have two potential causes. So no, I don't have a specific moment in time where she had symptoms."

Dr. Izquierdo agreed that he could not say with medical certainty that lifting at work in January 2014 was "[t]he cause" of claimant's rotator cuff tear.

¶ 22    Dr. Izquierdo went on to testify that someone with a rotator cuff tear would have symptoms if he or she used the shoulder and put overload or strain on the rotator cuff. He stated there were "a myriad of things that [could] cause *** worsening pain with rotator cuff pathology." However, there were also individuals with such injuries who were asymptomatic. Dr. Izquierdo stated that "with the rotator cuff tear, every time you move your arm, pick up your arm, use your arm you could, theoretically, propagate the tear." Additionally, he agreed that there was "nothing in [his] record to show that [claimant's] lifting at work accelerated the underlying condition of the rotator cuff," rather than "just [bringing] about *** increased symptoms."

¶ 23    Dr. Izquierdo testified he would correct the causation opinion from his February 3, 2014, office note that "all" of claimant's symptoms were directly related to her January 18, 2014, work activities by removing the word "all" and saying "her symptoms were worse because of" her work activities. He agreed that, in finding claimant's symptoms were worse, he relied on the history provided by claimant. Dr. Izquierdo ultimately agreed, however, that he could not state with any medical certainty that claimant's January 2014 work activities "changed" her rotator cuff tear. On further questioning by the employer's counsel, Dr. Izquierdo testified he was of the opinion that it would be difficult to repetitively cause the type of pathology claimant had over a 12-hour shift. He stated it was "possible" that she could have completed a partial tear while hoisting or lifting a patient but that he could not reach such an opinion with a reasonable degree of medical certainty. Dr. Izquierdo indicated, however, he could reach such an opinion with a different history, stating as follows: "[I]f I would have had a history, a moment in time where she

said, 'oh my god, at 2:15, I lifted this lady, and my arm hurt substantially more,' some—'Now I can't pick up my arm,' that's a different history, right, but I don't have that history." Further, he emphasized that "if there was a reported and documented moment or incident in time *** [claimant] could have made [her rotator cuff tear] bigger."

¶ 24    The record further reflects that on April 22, 2014, claimant was examined by Dr. Prasant Alturi, an orthopedic surgeon, at the employer's request. Dr. Alturi authored a report regarding his examination that was submitted at arbitration. He noted claimant provided a history of injuring her right shoulder on January 18, 2014, while working as a floor nurse. Claimant asserted she was required to constantly move and reposition a patient and that she " 'kept aggravating it, boosting her up.' " According to Dr. Alturi, claimant acknowledged having a "prior shoulder injury in mid-December 2013," which occurred when she " 'missed a step' at home." He noted claimant had been sore since her fall at home but that she described her symptoms as being "minimal" by the date of her alleged work accident.

¶ 25    Dr. Alturi's impression was that claimant suffered a right rotator cuff tear that was surgically repaired. In his report, he provided an opinion that claimant's right shoulder condition was not causally related to her work activities. He stated as follows:

"[Claimant] indicated that her symptoms were due to repetitively assisting with the positioning of one of her patients at work. She indicated that all of these activities were done with her arms below shoulder level while she was trying to reposition the patient. There was no impact or sudden load to the upper extremities. There was no overhead lifting. These types of activities could not have caused [claimant's] right shoulder rotator cuff tear. These types of activities could not have caused any aggravation of a right shoulder rotator cuff tear. [Claimant's] right shoulder rotator cuff tear is more plausibly

attributable to the incident when she fell while on a staircase at home. This is consistent with the clinical documentation as well as within her clinical findings."

¶ 26    Dr. Alturi's deposition was taken on December 10, 2014, and submitted into evidence at arbitration. He testified consistently with his report and opined claimant's right rotator cuff tear was not causally related to her January 2014 work activities. Dr. Alturi noted claimant reported performing repetitive activities at work and demonstrated the position of her upper extremities while performing those activities. He noted claimant did not report any impact to her upper extremities while at work, "any sudden load to her upper extremities" while at work, or any overhead exposure associated with lifting or forceful use of her upper extremities. Rather, Dr. Alturi opined that claimant's condition was most "consistent with a traumatic rotator cuff tear from a fall that was painful" he stated it was likely claimant then felt pain while performing activities at work and at home. Further, he stated it was "not possible to get a full thickness rotator cuff tear, or even aggravate a full thickness rotator cuff tear with the type of activities [claimant] described."

¶ 27    Dr. Alturi disagreed with Dr. Izquierdo's opinion that lifting activities below the shoulder could damage the rotator cuff. He stated it was not plausible to damage the rotator cuff in such a way because "when the arms are below shoulder level the rotator cuff is not really contributing in any meaningful fashion to the application of force." During examination by the employer's counsel, Dr. Alturi clarified that his opinion regarding arm position concerned "activity related damage to the rotator cuff" rather than "a traumatic rotator cuff injury."

¶ 28    On examination by claimant's counsel, Dr. Alturi testified it was his understanding that claimant continued working full duty for the employer without accommodations or restrictions after her December 2013 fall and prior to January 18, 2014. It was also his understanding that

claimant was unable to work after January 18, 2014. Further, he acknowledged that there were ways that claimant could have completed a small or partial rotator cuff tear when hoisting or lifting a heavy patient. However, he did not believe that is what occurred in claimant's case based in large part on the way she described that she was adjusting her patient. Dr. Alturi admitted that if his history was incorrect his opinion could change.

¶ 29     On February 17, 2015, the arbitrator issued his decision in the matter, finding claimant sustained work-related injuries arising out of and in the course of her employment on January 18, 2014, and awarding her $34^3/_7$ weeks' TTD benefits and medical expenses. The arbitrator relied on Dr. Izquierdo's opinions over those provided by Dr. Alturi and found that even if claimant injured her right shoulder in December 2013, "the activity she reported at work on January 18, 2014[,] unquestionably increased whatever symptoms she was having as a result thereof and caused her to seek medical care."

¶ 30     On March 16, 2016, the Commission reversed the arbitrator's decision and denied claimant compensation under the Act. It found claimant failed to prove she sustained an accident arising out of and in the course of her employment on January 18, 2014, or that her current condition of ill-being was causally related to her employment. In so holding, the Commission determined claimant was not credible. It also found that both Dr. Izquierdo and Dr. Alturi essentially agreed that the history and mechanism of injury claimant described prior to the date of arbitration was not a reasonable or likely cause of her shoulder condition of ill-being. The Commission concluded that the evidence, instead, "support[ed] Dr. Alturi's belief that subsequent to the fall at home, [claimant] was most likely experiencing right shoulder symptoms outside of and unrelated to her work duties prior to January 18, 2014."

¶ 31    Claimant sought judicial review of the Commission's decision with the circuit court of McHenry County. On March 8, 2017, the court reversed the Commission's decision, finding it was against the manifest weight of the evidence. It ordered the arbitrator's decision reinstated.

¶ 32    This appeal followed.

¶ 33                        II. ANALYSIS

¶ 34    Initially, we note that, in her appellee's brief, claimant argues the employer's appeal should be dismissed for a lack of appellate jurisdiction. She argues that the signature of the employer's counsel that appears on its notice of appeal does not match counsel's signature on another document in the record. Therefore, she maintains that the notice of appeal was not properly signed by the employer's counsel and a jurisdictional requirement is lacking. We note, however, that claimant previously filed a motion to dismiss the employer's appeal and raised this same jurisdictional argument. On June 29, 2017, this court denied her motion. Thus, her claim has been addressed and found to be without merit. We adhere to our previous decision on the matter and decline to further consider it.

¶ 35    As to the merits of the appeal, the employer argues the Commission's finding that claimant failed to prove a compensable, work-related injury was supported by the record and not against the manifest weight of the evidence. After reviewing the record, we agree with the employer's argument and find the circuit court erred by reversing the Commission's decision.

¶ 36    "To obtain compensation under the Act, a claimant bears the burden of showing, by a preponderance of the evidence, that he has suffered a disabling injury which arose out of and in the course of his employment." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 671 (2003). The "in the course of employment" phrase "refers to the time, place and circumstances surrounding the injury" and, to be compensable, an injury "generally must occur

within the time and space boundaries of the employment." *Id.* "The 'arising out of' component is primarily concerned with causal connection" and is satisfied by a showing "that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Id.*

¶ 37    In cases involving a preexisting condition of ill-being, recovery depends upon "the employee's ability to show that a work-related accidental injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to have been causally connected to the work-related injury and not simply the result of a normal degenerative process of the preexisting condition." *Id.* at 204-05. Ultimately, an "[a]ccidental injury need not be the sole causative factor, nor even the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being." (Emphasis in original.) *Id.* at 205.

¶ 38    Here, the parties first disagree on the appropriate standard of review by this court. The employer maintains that the Commission's decision should not be overturned unless it is against the manifest weight of the evidence while claimant argues that a clearly erroneous standard of review applies. We agree with the employer.

¶ 39    "As a general rule, the question of whether an employee's injury arose out of and in the course of his employment is one of fact for the Commission." *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 38, 48 N.E.3d 679; see also *Sisbro*, 207 Ill. 2d at 205 ("Whether a claimant's disability is attributable solely to a degenerative process of the preexisting condition or to an aggravation or acceleration of a preexisting condition because of an accident is a factual determination to be decided by the Industrial Commission."). On review, the Commission's determinations on factual matters will not be disturbed unless they are against the manifest weight of the evidence. *Bolingbrook Police*

*Department*, 2015 IL App (3d) 130869WC. "A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent." *Id.*

¶ 40    Further, "[i]n resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674, 928 N.E.2d 474, 482 (2009). "The relevant inquiry is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other might reach an opposite conclusion." *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 538-39, 865 N.E.2d 342, 353 (2007).

¶ 41    In certain cases, a clearly erroneous standard of review has been applied where the issue presented on appeal contained a mixed question of law and fact. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998). " 'A mixed question is one involving an examination of the legal effect of a given set of facts, that is, where the facts and law are established and the issue is whether the facts satisfy a certain statutory standard.' " *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 544, 950 N.E.2d 256, 261 (2010) (quoting *Western & Southern Life Insurance Co. v. Edmonson*, 397 Ill. App. 3d 146, 151, 922 N.E.2d 1133, 1139 (2009)).

¶ 42    Here, the relevant underlying facts have not been "established" and are very much in dispute. Thus, we are not simply examining the legal effect of a given set of facts but, instead, considering the Commission's resolution of disputed facts, including the manner in which it resolved evidentiary conflicts and assessed witness credibility. Thus, the appropriate standard of review in this case is the manifest-weight-of-the-evidence standard.

¶ 43    Additionally, we find that the clearly erroneous standard is inapplicable when reviewing decisions of the Commission. In *Belvidere*, 181 Ill. 2d at 205, our supreme court first applied the clearly erroneous standard to judicial review of an administrative agency's decision. However, unlike this case, *Belvidere* involved an order of the Illinois State Labor Relations Board (Board) under the Illinois Public Labor Relations Act (5 ILCS 315/1 to 28 (West 2012)). *Belvidere*, 181 Ill. 2d at 204. Further, the Board's decision in that case was governed by the Administrative Review Law. *Id.* (citing 735 ILCS 5/3-110 (West 1994)). We note that the Administrative Review Law does not apply in the context of a workers' compensation proceeding. *Wal-Mart Stores, Inc. v. Industrial Comm'n*, 324 Ill. App. 3d 961, 966, 755 N.E.2d 98, 102 (2001) ("The Act clearly does not adopt the Administrative Review Law."). Thus, this case is procedurally distinguishable from *Belvidere*.

¶ 44    Moreover, even after *Belvidere* our supreme court has continued to apply only the manifest-weight-of-the-evidence and *de novo* standards of review in workers' compensation cases. In *Johnson v. Illinois Workers' Compensation Comm'n*, 2011 IL App (2d) 100418WC, ¶ 18, 956 N.E.2d 543, we expressly noted that the "supreme court has never applied [the clearly erroneous standard] to an appeal involving a decision of the Workers' Compensation Commission." That statement remains true today. See The *Venture—Newberg-Perini, Stone & Webster v. Illinois Workers' Compensation Comm'n*, 2013 IL 115728, ¶ 14, 1 N.E.3d 535 (recognizing only the application of manifest-weight and *de novo* standards when reviewing decisions of the Commission).

¶ 45    To support her contention that the clearly erroneous standard should apply in this case, claimant cites this court's decision in *Dodaro*, 403 Ill. App. 3d at 545, wherein we employed the clearly erroneous standard when reviewing a decision of the Commission. However, as support

for applying that standard in *Dodaro*, we relied on case authority outside of the workers' compensation framework, which dealt with decisions from administrative agencies other than the Commission. *Id.* As a result, we decline to follow that decision. Further, we emphasize that, unless and until the supreme court directs otherwise, we continue to apply only the manifest-weight-of-the-evidence and *de novo* standards of review when reviewing decisions of the Commission.

¶ 46    We now turn to the merits of the employer's appeal. Here, in finding a non-compensable injury, the Commission first determined that both parties' medical experts "largely agree[d] that the history and mechanism of injury described by [claimant was] not a reasonable or likely cause of the right shoulder condition surgically treated by Dr. Izquierdo." This finding is supported by the record. As noted by the Commission, prior to testifying at arbitration, claimant repeatedly and consistently described a repetitive-trauma type work injury. Dr. Alturi opined claimant's right shoulder injuries were most "consistent with a traumatic rotator cuff tear from a fall that was painful." He did not believe it was possible for claimant to have caused or aggravated her rotator cuff tear with the type of work activities she described to him, which involved constantly moving and repositioning a patient.

¶ 47    Additionally, although Dr. Izquierdo initially offered an opinion that causally related claimant's right shoulder and arm condition to her work for the employer, he later significantly qualified that opinion both in his October 2014 letter and during his deposition. Dr. Izquierdo acknowledged that claimant's December 2013 fall could have caused her rotator cuff tear and agreed that he could not state with "medical certainty" that her January 18, 2014, work activities either "caused" or "changed" her condition. Importantly, he opined that it would be difficult to cause the type of pathology that claimant had simply by repetitive movement over a 12-hour

shift. Further, although he stated it was possible for claimant to aggravate such an injury while hoisting or lifting a patient, he would have expected a different history than the repetitive-trauma type history that claimant reported to him. Specifically, Dr. Izquierdo testified he would expect "a moment in time where she said, 'oh my god, at 2:15, I lifted this lady, and my arm hurt substantially more.' "

¶ 48    In providing his opinions, Dr. Izquierdo reiterated several times that "if there was a reported and documented moment or incident in time *** [claimant] could have made [her rotator cuff tear] bigger." However, he also repeatedly stated that he was never provided with such a history by claimant. As a result, Dr. Izquierdo could not offer an opinion on causation based on a reasonable degree of medical certainty.

¶ 49    Moreover, to the extent Dr. Izquierdo's opinion on causation could be construed as supporting the existence of a causal connection, we note his opinion was based on the history provided to him by claimant, whom the Commission found was not credible. The Commission's credibility determination is also supported by the record.

¶ 50    The Commission first found claimant was not credible regarding her December 2013 fall at home. It noted that although claimant tried to minimize the fall when testifying at arbitration, stating that she merely missed a single step, fell to her buttocks, and "bumped" her right shoulder, it was nevertheless significant enough that symptoms in claimant's right upper extremity continued to bother her one month later. The record supports this finding by showing claimant contacted Dr. Izquierdo's office to schedule an appointment regarding her right shoulder on January 15, 2014, three days prior to her alleged work accident. As noted by the Commission, Dr. Izquierdo was an orthopedic surgeon who specialized in shoulder treatment. Further, Dr. Izquierdo's records do not support claimant's contention at arbitration that her

December 2013 fall was only a minor incident. Contrary to claimant's testimony that she missed a step, medical records indicate claimant reported to Dr. Izquierdo's office that she "fell down the stairs in her home." Further, an MRI scan was prescribed "due to the traumatic nature of the initial injury."

¶ 51    Second, the Commission also found claimant was not credible because, contrary to her testimony at arbitration, neither her accident report nor the medical histories she provided delineated "a specific episode of sudden or significant pain while lifting a particular patient on January 18, 2014." The evidence at arbitration supports this finding, showing claimant's first report of an "oh wow" or "oh boy" moment of experiencing symptoms was while testifying at arbitration. Her arbitration testimony also occurred after claimant attended Dr. Izquierdo's deposition and heard him describe the importance of such a specific painful moment in time relative to claimant's condition of ill-being. As the Commission found, claimant's "subsequent testimony at arbitration gives a strong indication that an effort was made to closely conform to [Dr. Izquierdo's] reasoning in order [to] show causation."

¶ 52    On appeal, claimant responds to the employer's arguments and the Commission's finding of no compensable injury by arguing that the Commission failed to properly consider that she worked full-duty without restrictions after her December 2013 fall but was unable to continue working following her January 2014 work accident. She argues that " '[a] chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury.' " *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 39, 976 N.E.2d 1 (quoting *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 63-64, 442 N.E.2d 908, 911 (1982)). We do not disagree that such

circumstantial evidence can support the existence of a causal connection. However, in this case, the Commission determined claimant's descriptions of both her initial injury and her condition of ill-being prior to her alleged work accident were not credible. As set forth above, the Commission's credibility determinations were supported by the record.

¶ 53    Further, in reaching its decision, the Commission pointed out that claimant worked "significantly less than her usual part-time schedule during the period between mid-December 2013[,] and January 18, 2014." Although claimant argues that factual finding was erroneous, claimant's own testimony at arbitration supports the Commission's decision. Specifically, claimant testified to only three specific days that she worked during the relevant time period between her fall at home and her alleged January 18, 2014, work accident.

¶ 54    Claimant also argues that the wage statement submitted by the employer contradicts the Commission's finding regarding the number of days she worked and, instead, shows she continued to perform full-duty work after her December 2013 fall. Initially, we note that the wage statement at issue covers only up to January 4, 2014, and, thus, it is not representative of the entire time period between claimant's fall at home and her alleged work accident. Additionally, the wage statement demonstrates only the total number of hours for which claimant was compensated by the employer and not the total number of hours claimant spent performing her regular, physical job duties. Again, claimant acknowledged during her arbitration testimony that there were times of "low census," during which she would be compensated for being on-call at home rather than performing her regular work duties as a floor nurse. Given the evidence presented, the Commission could reasonably infer that claimant worked less than her usual part-time schedule during the relevant time frame.

¶ 55    Here, the record contains sufficient support for the Commission's decision, thus an opposite conclusion from that reached by the Commission is not clearly apparent. As a result, the Commission's finding that claimant failed to prove a compensable injury was not against the manifest weight of the evidence.

¶ 56                                III. CONCLUSION

¶ 57    For the reasons stated, we reverse the circuit court's judgment and confirm the Commission's decision.

¶ 58    Circuit court's judgment reversed; Commission's decision confirmed.