2020 IL App (1st) 200184WC-U
No. 1-20-0184WC
Order filed October 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| JAMES ALEVIZOS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-L-50035 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION | ) | |
| | ) | Honorable |
| (Relco Electric Company, Defendant- | ) | Daniel P. Duffy, |
| Appellee). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*: The Illinois Workers' Compensation Commission's finding that claimant failed to prove that the current condition of ill-being of his low back is causally related to his compensable work accident of December 1, 1995, and its resulting denials of his petitions under sections 8(a) and 19(h) of the Workers' Compensation Act (820 ILCS 305/8(a), 19(h) (West 2006)) were against the manifest weight of the evidence.

¶ 2     Claimant, James Alevizos, appeals from an order of the circuit court of Cook County confirming a decision of the Illinois Workers' Compensation Commission (Commission) denying

his petitions for review under sections 8(a) and 19(h) of the Workers' Compensation Act (Act) (820 ILCS 305/8(a), 19(h) (West 2006)) in which he sought additional compensation for injuries he sustained to his low back on December 1, 1995, while in the employ of respondent, Relco Electric Company. The Commission denied the petitions on the basis that claimant failed to demonstrate that his physical condition after the arbitration hearing in April 2004 was causally related to the compensable work accident of December 1, 1995. We reverse the judgment of the circuit court, reverse the decision of the Commission, and remand the cause to the Commission for further proceedings.

¶ 3                                    I.  BACKGROUND

¶ 4      Claimant filed an application for adjustment of claim on January 9, 1996, alleging injuries resulting from an accident on December 1, 1995, while working for respondent. An arbitration hearing on claimant's application for adjustment of claim was held on April 28, 2004. The issues in dispute were causal connection, temporary total disability, medical expenses, and nature and extent of injury (including whether claimant was entitled to a wage-differential benefit).

¶ 5      At the arbitration hearing, claimant testified that he worked as a union electrician. He initially injured his low back on August 30, 1991, after sustaining an electrical shock and falling from a ladder. A lumbar MRI dated September 26, 1991, revealed degenerative changes and minimal annular bulging of the L4-L5 and L5-S1 discs. Claimant was diagnosed with a low-back strain and eventually returned to work as an electrician.

¶ 6      On December 1, 1995, while working for respondent, claimant sustained a second injury. Claimant testified that he caught his right foot in the indentation of a steel staircase, causing his ankle to twist. Claimant presented to Dr. Houshang Farahvar, an orthopaedic surgeon, for

treatment. On December 8, 1995, claimant underwent right ankle surgery, which involved a repair with hardware insertion for complete ligament ruptures of the right ankle with subluxation of the mortise. An operation to remove the hardware was performed on February 2, 1996.

¶ 7      Claimant testified that in the months following the December 1995 accident, he was unable to bear weight on the right ankle. This caused an altered gait and increased low-back pain. As a result, Dr. Farahvar prescribed physical therapy for the low back. During this time, claimant was also under the care of Dr. Peter Petrovas, a chiropractor who referred him to Dr. Per Freitag, an orthopaedic surgeon. Dr. Freitag prescribed a work-hardening program for the right ankle. Claimant testified that on August 22, 1996, while lifting a 55-pound crate during work hardening, he noticed increased low-back pain and numbness down the right leg. Claimant testified that this lift "did him in." Thereafter, claimant began treating for low-back pain with Dr. Richard Noren, who diagnosed right sciatica. A lumbar MRI taken on October 24, 1996, revealed a central L5-S1 disc herniation. On February 19, 1997, Dr. Freitag performed an L5-S1 lumbar discectomy with foraminotomies bilaterally. Following the operation, claimant continued to complain of low-back pain. On November 3, 1998, Dr. Freitag diagnosed claimant with failed-back syndrome.

¶ 8      On February 13, 1999, claimant moved to California to be near family. Claimant's brother, Dr. John Alevizos, assumed his care and referred claimant to Dr. Donald DeFeo. Dr. DeFeo referred claimant to Dr. Gary Bennett, a pain-management physician, who performed a series of lumbar injections. A discogram taken on July 15, 1999, was positive at L4-L5 and L5-S1. A lumbar myelogram taken on December 7, 1999, revealed intervertebral disc narrowing at L5-S1 with minimal grade I retrolisthesis of L5 on S1. On February 22, 2000, Dr. DeFeo performed a lumbar

fusion at L5-S1 with Ray cages. Thereafter, claimant continued to treat with Dr. DeFeo and Dr. Bennett. Claimant last saw Dr. DeFeo on February 11, 2003.

¶ 9     At the request of his attorney, claimant was examined by Dr. Jeffrey Coe on August 28, 1997, and January 22, 2002. Dr. Coe found that the injury to the right ankle on December 1, 1995, resulted in a significantly abnormal gait which stressed the low back. Dr. Coe further opined that the right ankle injury necessitated the work-hardening program during which claimant suffered a disc herniation at L5-S1. Dr. Coe testified that following the surgery by Dr. Freitag on February 19, 1997, claimant developed chronic lumbar instability at L5-S1 which necessitated the fusion of February 22, 2000, performed by Dr. DeFeo. Dr. Coe testified that claimant's low-back condition had reached a state of permanency as of June 6, 2000, and that he could return to work with a 30-pound lifting restriction.

¶ 10     The arbitrator issued his decision on June 7, 2004, finding a causal relationship between the conditions of ill-being involving claimant's low back and right ankle and the December 1, 1995, accident. The arbitrator awarded claimant medical expenses and temporary total disability benefits. Regarding the nature and extent of the injury, the arbitrator determined that claimant failed to prove that he was entitled to a wage-differential award under section 8(d)1 of the Act (820 ILCS 305/8(d)1 (West 2004)). In support of this determination, the arbitrator found that there was no evidence that claimant attempted to seek alternative employment within his restrictions and that claimant is "clearly able to perform beyond the physical limitations of his doctors." With respect to the latter finding, the arbitrator referenced three videotapes of claimant lifting weights. The arbitrator noted that on one of the videotapes, claimant is seen at a workout session bench pressing 275 pounds with a spotter after having already done multiple repetitions with increasing

weights ranging from 135 pounds (9-10 repetitions), 185 pounds (8 repetitions), and 225 pounds (5 repetitions). The arbitrator also cited claimant's physical appearance at the hearing, which he described as "well-tanned and physically fit." The arbitrator concluded that the videotapes and claimant's physical appearance belied claimant's contention that he was unable to return to work as an electrician. However, because the evidence established that claimant sustained significant injuries to his back and foot, the arbitrator awarded claimant 338.75 weeks of permanency benefits, representing a 25% loss of use of claimant's right foot pursuant to section 8(e) of the Act (820 ILCS 305/8(e) (West 2004)), and, relative to claimant's back, a 60% loss of use of the person as a whole pursuant to section 8(d)2 of the Act (820 ILCS 305/8(d)2 (West 2004)). Each party filed a petition for review of the arbitrator's decision with the Commission. On May 24, 2007, the Commission affirmed and adopted the decision of the arbitrator. Neither claimant nor respondent sought judicial review of the Commission's decision.

¶ 11    On May 11, 2007, claimant filed a petition for review pursuant to sections 8(a) and 19(h) of the Act (820 ILCS 305/8(a), 19(h) (West 2006)) based on a claim of additional disability and medical treatment involving the low back. Thereafter, claimant filed additional petitions pursuant to sections 8(a) on October 15, 2009, and April 19, 2017, and pursuant to section 19(h) on November 4, 2009. On May 8, 2014, while awaiting a hearing on the petitions, Dr. Gregory Carlson, claimant's treating orthopaedic surgeon, authored a letter stating that, based on claimant's low-back condition, claimant should not undertake a four-hour plane ride to appear for a hearing in Illinois. Therefore, by agreement of the parties and Commissioner Kevin Lamborn, claimant testified by deposition in California on May 18, 2017. After numerous continuances, a hearing on

the petitions was held before Commissioner Lamborn on December 14, 2017. The following is a summary of the evidence presented at that hearing.

¶ 12    Claimant testified that he is 51 years old. Since relocating to California, Dr. Alevizos, his brother, has acted as his primary-care physician. All the physicians who examined claimant in California have been at the referral of Dr. Alevizos. Claimant testified that after the April 28, 2004, arbitration hearing, he began to experience increasing symptoms in his back and legs which caused him to return to Dr. Bennett on June 29, 2006. Dr. Bennett's note of that visit reflects that claimant did not experience significant improvement following Dr. DeFeo's operation in February 2000. Dr. Bennett diagnosed severe lumbar radiculopathy secondary to previous disc disease at L4-L5 with probable unstable spine at L4-L5. He recommended conservative treatment, including epidural and transforaminal steroid injections, and indicated that additional lumbar surgery may be needed.

¶ 13    On February 28, 2007, claimant presented to Dr. Kamran Aflatoon for a "lumbar spine consultation." Dr. Aftlatoon's office note reflects that since Dr. DeFeo's operation, claimant has experienced low-back pain, leg weakness, and urinary incontinence. Upon examination, claimant reported increasing pain with range of motion. Dr. Aflatoon noted decreased range of motion of the lumbar spine with forward flexion, extension, lateral bending bilaterally, and rotation bilaterally. Dr. Aflatoon opined that claimant had a non-union at L5-S1 and a disc herniation at L4-L5. He found claimant totally disabled and in need of additional back surgery to improve his quality of life.

¶ 14    On May 16, 2007, Dr. Aflatoon authored an addendum to his February 28, 2007, evaluation, stating that claimant's "current status" was causally related to his 1995 accident while

working for respondent. Dr. Aflatoon ordered an EMG/NCV study of the bilateral legs and a CT myelogram of the spine. The EMG/NCV study was performed on October 23, 2007, and indicated lumbosacral nerve-root irritation, mostly at the L5-S1 level. The CT myelogram was taken on November 6, 2007, and revealed that the left cage device used in Dr. DeFeo's February 2000 lumbar fusion surgery was extending into the left L5-S1 neural foramen resulting in moderate left foraminal stenosis and compression of the exiting left L5 nerve root. After reviewing these studies, Dr. Aflatoon opined that the position of the left cage device would need to be addressed.

¶ 15    On March 4, 2008, at respondent's request, claimant underwent an independent medical examination by Dr. Stewart Shanfield, an orthopaedic surgeon. Claimant reported bilateral radicular pain associated with numbness and tingling which had become progressively worse since 2003. Upon examination, Dr. Shanfield noted that claimant exhibited diffuse tenderness along the lumbar area of his spine. Claimant complained of increased pain of the lumbar spine with forward flexion and extension. Straight-leg raising tests were positive bilaterally at 50 degrees. Claimant had diminished sensation along the lateral aspect of both legs, left worse than right. Dr. Shanfield noted that the November 2007 CT myelogram reflected that the cage from Dr. DeFeo's February 2000 surgery was in the left neural foramen and impinging along the L5 and S1 nerve root. Dr. Shanfield's diagnoses included bilateral lumbar radiculopathy and probable instability of the lumbar spine at either the L5-S1 and/or L4-L5 level. Dr. Shanfield concluded that claimant may require further surgery, including an extension of the lumbar fusion. Dr. Shanfield opined that claimant's complaints were causally related to the February 2000 surgery and the December 1, 1995, work accident. He further stated that claimant was not capable of returning to gainful employment until the full resolution of his medical and pain issues.

¶ 16    Claimant returned to Dr. Aflatoon on April 23, 2008. At that time, Dr. Aflatoon recommended a spinal stimulator to reduce claimant's pain and a second opinion from the Santa Monica Spine Institute. When claimant saw Dr. Aflatoon on July 23, 2008, Dr. Aflatoon stated that further surgery was not "indicated" for claimant, that he was permanently disabled, that he cannot be gainfully employed, and that he would require lifelong medication to control his chronic pain. On August 21, 2008, Dr. Bennett stated that due to the extremely complex condition, he would be unable to follow claimant on a long-term basis.

¶ 17    Upon referral of Dr. Alevizos, claimant treated with Dr. Miguel Dominguez for pain management from September 30, 2008, through June 14, 2011. At claimant's initial evaluation, he told Dr. Dominguez that he "rarely" exercises. However, beginning in 2010, Dr. Dominguez's reports reflect that claimant "usually" exercises. Dr. Dominguez's treatment consisted of medication and injections. Claimant underwent a spinal-cord stimulator trial on February 18, 2009. Claimant reported little change in his symptomatology during the trial. Dr. Dominguez noted that at a visit on October 20, 2009, he and his assistant observed claimant "outside the office in the parking lot, running around the car trying to tell his mom [who had accompanied claimant to the office] how to park the car and *** walking perfectly fine without any pain or discomfort." However, when claimant entered Dr. Dominguez's office, he was "limping and walking very slowly" and appeared to be in a lot of distress. Further, when approached in the examination room, claimant "start[ed] a voluntary general body spasm." Dr. Dominguez noted that this happened at each visit, but when asked to stop, claimant would cease shaking. Dr. Dominguez described claimant's behavior as an "amplification of his symptoms."

¶ 18    Upon referral of Dr. Alevizos, claimant began treating with Dr. Rick Delamarter of the Spine Institute of Santa Monica on March 25, 2009. Dr. Delamarter agreed that the left cage used in Dr. DeFeo's February 22, 2000, surgery was protruding into the canal. He recommended surgery to correct the malalignment and a revision at L5-S1 with extension to L4-L5 which was previously positive on a discogram. Dr. Delamarter also referred claimant to Dr. George Graf for detoxification because he was taking a high dosage of narcotics, including OxyContin, Fentanyl, Valium, Norco, Amrix, and Toradol.

¶ 19    Dr. Shanfield conducted a second examination of claimant on May 28, 2009. At that time, claimant reported low-back pain and periodic numbness in the legs. He denied any subsequent injuries or re-aggravations of his condition since the original injury. Dr. Shanfield's diagnoses included bilateral lumbar radiculopathy, chronic pain disorder, and malalignment of Ray cages with impingement of bilateral L5 nerve roots. Dr. Shanfield recommended surgery to remove the Ray cages. He also stated that an anterior and posterior fusion encompassing L4 to S1 seemed "appropriate." Dr. Shanfield estimated that recovery from the surgery would take six months to one year. He hoped that, following surgery, claimant would be able to return to some type of gainful employment, but noted it would likely be a sedentary position. Following Dr. Shanfield's examination, respondent approved Dr. Delamarter's recommended surgery.

¶ 20    On January 28, 2010, Dr. Delamarter performed low-back surgery which included trimming the misaligned Ray cages at L5-S1, an L4-L5 anterior-posterior fusion, and an L5-S1 revision decompression and fusion. The post-operative diagnosis was failed-back syndrome. Claimant treated with Dr. Delamarter after surgery. At Dr. Delamarter's request, claimant underwent a lumbar CT scan and EMG/NCV study on December 20, 2010. The EMG/NCV study

was abnormal. The CT scan revealed that a metal spacer device at L5-S1 was protruding into the neural foramen by approximately four millimeters. Claimant testified that his condition was deteriorating during this period. On February 1, 2011, Dr. Delamarter determined that claimant was no longer a surgical candidate and referred him to Dr. Hormoz Zahiri for treatment. Claimant testified that after February 1, 2011, respondent disputed further medical care.

¶ 21    On April 1, 2011, claimant presented to Dr. Zahiri, an orthopaedic surgeon specializing in complex orthopaedic conditions. Claimant told Dr. Zahiri that he experiences constant pain in the low back as well as numbness, tingling, and radiation of pain down the left leg. Claimant rated his pain level in the low back and left leg at 10 out of 10 despite taking pain medication. Upon examination, Dr. Zahiri noted that claimant's range of motion was limited by severe pain. Dr. Zahiri agreed that the December 2010 CT scan revealed that a metal cage at L5-S1 had protruded into the left foramina and was causing left-sided severe radiculopathy. Dr. Zahiri stated that claimant remained temporarily totally disabled and referred him to Dr. Carlson for a revision of the lumbar fusion.

¶ 22    Claimant presented to Dr. Carlson on May 13, 2011. Dr. Carlson diagnosed failed-back syndrome and residual neural impingement related to the malposition of a left posterior lumbar interbody cage into the foraminal zone at L5-S1. Dr. Carlson recommended surgery. Prior to surgery, Dr. Carlson discussed with claimant the risks associated with the procedure, including the failure of instrumentation, a dural tear resulting in a spinal leak, arachnoiditis, and adjacent level disease. On June 28, 2011, Dr. Carlson performed revision surgery which involved removing and replacing the L5-S1 interbody cages and extending the fusion to L4-S1.

¶ 23    Beginning on July 22, 2011, claimant saw Dr. Albert Lai. Dr. Albert Lai's treatment consisted of medication management and multiple lumbar injections. Due to increasing pain and left leg issues, a lumbar myelogram and CT scan were performed on April 13, 2012, and a lumbar MRI was performed on May 1, 2012. Those tests revealed possible pseudomeningocele, which Dr. Carlson explained is a persistent leakage of spinal fluid from the spinal canal. On May 31, 2012, Dr. Carlson performed a procedure to repair the leak.

¶ 24    On November 1, 2012, Dr. Albert Lai performed a dorsal column stimulator trial. The stimulator was removed a week later. On December 12, 2012, Dr. Carlson indicated that claimant had developed "significant mental health issues" that rendered him disabled from performing any meaningful work. On May 22, 2013, Dr. Carlson discussed a pain pump. On June 6, 2013, Dr. Bradley Noblett implanted an intrathecal pain pump. On August 21, 2013, claimant returned to Dr. Carlson, complaining that the implanted device caused more pain. An EMG showed chronic neurogenic changes in the lumbar paraspinal muscle with no evidence of radiculopathy. Dr. Carlson released claimant from his care, indicating that there were no further surgical procedures he could offer, and recommended continuing pain management with Dr. Albert Lai.

¶ 25    At Dr. Alevizos's request, claimant underwent a lumbar myelogram and CT scan on May 7, 2014. Dr. Carlson interpreted the studies as showing significant arachnoiditis, a scarring within the thecal sac. Dr. Carlson explained that arachnoiditis is a risk associated with surgery and that it is associated with back pain, leg pain, and sciatica and can be an ongoing or additional cause for persistent pain. Dr. Carlson testified that there is no cure for arachnoiditis. In Dr. Carlson's view, claimant was totally disabled and unable to obtain any gainful employment. Dr. Carlson referred claimant to Dr. J. Patrick Johnson for a second opinion.

¶ 26     Claimant saw Dr. Johnson on June 16, 2014. Dr. Johnson concurred with the diagnosis of arachnoiditis and referred claimant to Dr. Joshua Prager, a pain-management physician. Claimant was under the care of Dr. Prager from July 2, 2014, through September 9, 2014. Dr. Prager diagnosed failed-back-surgery syndrome. On September 2, 2014, Dr. Prager performed further surgery involving revision of the placement of the pain pump to optimize medications.

¶ 27     On September 23, 2015, Dr. Steven Feinberg examined claimant at respondent's request and prepared several reports detailing his findings. Dr. Feinberg, who is board certified in physical medicine and rehabilitation and pain medicine, testified by evidence deposition on June 20, 2017. As part of his examination, Dr. Feinberg reviewed an 8.5-inch stack of records. Dr. Feinberg noted that claimant had a "major" lumbar pathology after all his surgeries but found a lack of objective physical findings on evaluation. Dr. Feinberg felt that claimant suffered from considerable pain behavior and symptom magnification, citing claimant's report to him that he was suffering from moderate depression with frequent suicidal ideation and pain at level 10 on a 10-point scale. Dr. Feinberg's diagnoses were failed-back syndrome, psychiatric comorbidity (*i.e.*, psychological factors affecting claimant's physical condition), and chronic pain syndrome. Dr. Feinberg concluded that there was a causal relationship between the December 1, 1995, work injury and claimant's current disability. He stated that, "from a purely physical standpoint," claimant would be expected to be able to work in a sedentary capacity, although his overall presentation would make engagement in work impossible. Dr. Feinberg recommended that claimant participate in a functional restoration and chronic pain program with a detoxification component. Dr. Feinberg agreed that arachnoiditis is a significant diagnosis that can result in severe back and leg pain with

neurological problems. He acknowledged that it can be a debilitating condition and that there is no surgery or procedure to "get rid" of arachnoiditis.

¶ 28    Upon referral of Dr. Alevizos, claimant received additional pain management from multiple physicians, including Dr. Afshin Gerayli, Dr. Kais Alsharif, and Dr. Marc Cheng. Treatment consisted of medication management (including pain pump reprogramming and refills) and injections. Claimant testified that Dr. Cheng and Dr. Alsharif recommended reducing medication intake and weaning off the pain pump. To that end, use of the pain pump was discontinued on September 14, 2016, and the device was later surgically removed. Also in September 2016, claimant began treating with Dr. Khang Lai for pain management.

¶ 29    On September 28, 2016, claimant returned to Dr. Carlson. A lumbar X ray revealed marked settling at the adjacent levels of L3-L4 and L2-L3 with a slight shift of anterolisthesis between L3 and L4. According to Dr. Carlson, these were new findings at those levels. Dr. Carlson's diagnoses were adjacent segment progressive intervertebral collapse at L2-L3 and L3-L4 and remote fusion at L4-S1 with retained segmental hardware. A lumbar MRI taken on November 1, 2016, revealed a disc bulge at L2-L3 and a small disc protrusion at L3-L4. Dr. Carlson indicated that at L2 and L3, there had been a progressive intervertebral collapse with left paracentral disc extrusion measuring 12 millimeters by 5 millimeters by 10 millimeters, which was a change compared to previous MRI scans taken more than two year earlier. Upon referral of Dr. Carlson, Dr. Eric Chang performed an epidural injection at the L2 and L3 levels.

¶ 30    On May 19, 2017, Dr. Carlson, a board-certified orthopaedic surgeon, testified by evidence deposition. Dr. Carlson related that he first saw claimant on December 21, 1999, upon referral of Dr. DeFeo for a second opinion regarding surgery. At that time, based on positive discography,

Dr. Carlson recommended fusions at both the L4-L5 and L5-S1 levels. Dr. DeFeo's February 2000 procedure consisted solely of an L5-S1 posterior interbody fusion using Ray cages. After 1999, Dr. Carlson did not see claimant again until May 13, 2011, when he reviewed a December 20, 2010, CT scan and determined that the left Ray cage extended into the left foramen causing nerve impingement at the L5-S1 level. He diagnosed left leg radiculopathy status post interbody fusions with residual impingement of the nerve. Prior to making a final decision regarding surgery, Dr. Carlson recommended a lumbar myelogram and CT scan. Those studies confirmed that the cage was encroaching into the left L5-S1 neural foramen. On June 24, 2011, Dr. Carlson recommended surgery. The surgery, which was performed on June 28, 2011, involved an interior procedure, removal of the interbody cages at L5-S1, and placement of new interbody cages. Dr. Carlson opined that the migration of the hardware was a consequence of claimant's original injury.

¶ 31    Dr. Carlson further testified that claimant's current diagnosis is a new L2-L3 paracentral disc herniation and progressive intervertebral collapse at L2-L3 and L3-L4. Dr. Carlson opined that the adjacent level problems are causally related to the original work injuries. He stated that claimant is at risk to require further surgeries at L2-L3 and L3-L4. Claimant also has residual lumbar radiculopathy, arachnoiditis, and a cervical condition. In Dr. Carlson's view, there is a psychological component to claimant's condition. He also acknowledged that there have been issues regarding the proper amount of medication. Dr. Carlson testified that claimant would benefit from ongoing pain management, functional restoration care, mental health care, and psychological supports. Dr. Carlson testified that the lumbar condition of ill-being has reached a permanent state and that claimant is unable to return to gainful employment, even if sedentary.

¶ 32    Dr. Carlson reviewed the Commission's decision of May 24, 2007. He testified that all treatment after the April 28, 2004, arbitration hearing had a "very clear line of responsibility and causal relationship" to the lumbar condition on April 28, 2004, which was found to be causally related to the December 1, 1995, work accident. Migration of the hardware is a risk associated with surgery. Pseudomeningocele is a known risk of surgery. Arachnoiditis is a known complication of spinal surgery. Most recently, developing pathology at the adjacent levels of L2-L3 and L3-L4 is a known risk of lumbar fusion.

¶ 33    On cross-examination, Dr. Carlson testified that he did not envision claimant doing sedentary work because of his multiple surgeries, the physical disability, the objective physical limitations, and the arachnoiditis. Dr. Carlson acknowledged that when he wrote the May 8, 2014, letter stating that claimant was unable to take a plane trip to Illinois for a hearing, he had not seen claimant in almost nine months. Nevertheless, he knew that claimant would be unable to take the plane trip based on his extensive knowledge of claimant's symptoms and that there had not been a change in his condition.

¶ 34    Claimant testified that he has had no other accidents to his low back since the April 28, 2004, arbitration hearing. He testified that he continues to experience pain and weakness in the lower back and legs bilaterally, left worse than right. He related that since discontinuation of the pain pump, he has gradually reduced his medication and was off all medication at the time of his testimony. Claimant testified that he can drive short distances, but has difficulty ambulating without a cane or walker, is unable to engage in sexual activity, and experiences urinary incontinence. Claimant testified that he is still a member of a health club, although he no longer goes. He explained that within "the last decade," he has gone to the health club a couple of times

to sit in the whirlpool, but he got stuck and needed assistance to get out. He remains under the care of Dr. Carlson and Dr. Khang Lai. He has not returned to work in any capacity since February 28, 2007.

¶ 35    On cross-examination, claimant testified that since Dr. Delamarter's surgery in 2010, his condition has been on a "downhill slope." Claimant clarified that he last went to the health club "this year," but stated that he had to be carried out of the whirlpool. Claimant was not sure when he last worked out at the health club without using the whirlpool. Claimant answered many questions on cross-examination with the responses, "I don't recall" or "I don't remember."

¶ 36    On January 4, 2019, the Commission denied claimant's petitions for review under section 8(a) and 19(h) of the Act. The Commission found that claimant failed to demonstrate that his physical condition after the arbitration hearing on April 28, 2004, was causally related to his December 1, 1995, accident. Instead, the Commission concluded that claimant's condition of ill-being was "attributable to an undisclosed injury that occurred sometime after [claimant's] April 28, 2004, arbitration hearing." In support of its decision, the Commission cited gaps in claimant's medical treatment, the "questionable completeness" of claimant's medical records, and credibility issues with claimant and Dr. Carlson.

¶ 37    The Commission noted that there was no evidence that claimant received any medical treatment for his low back between February 11, 2003, when claimant last treated with Dr. DeFeo, and June 29, 2006, when he was seen by Dr. Bennett. This constituted a period of more than three years and four months. Even more significant to the Commission was the fact that claimant did not submit any records from his brother, Dr. Alevizos, who occasionally acted as his primary-care physician and coordinated his medical care. The Commission concluded that without a record from

Dr. Alevizos, there was no history to explain why claimant was referred to Dr. Bennett. Further, despite Dr. Bennett's recommendation that he undergo conservative treatment, claimant waited almost eight months before seeking additional care from Dr. Aflatoon. Moreover, Dr. Aflatoon's records reflect that claimant's condition had not worsened but had stayed static from 2000 until at least February 2007.

¶ 38    Regarding claimant's credibility, the Commission noted that the arbitrator questioned claimant's veracity in his April 28, 2004, decision, citing his physically-fit and well-tanned appearance and the videotapes showing claimant repeatedly lifting weights well in excess of the medically-imposed restriction. The Commission also pointed out that during the hearing on his section 8(a) and 19(h) petitions, claimant gave definitive answers to the questions posed on direct examination. However, on cross-examination, claimant, on 44 occasions, indicated that he did not recall or did not remember the topic being discussed. The Commission also found that claimant misrepresented the extent of his exercise activity, testifying that he did not exercise at the gym since at least 2007, but telling Dr. Dominguez, with whom he treated between 2008 and 2011, that he "usually" exercised. The Commission also concluded that claimant's "demonstrated on-again, off-again pain mannerisms as shown in the video recording of his [deposition] testimony" reflected negatively upon his credibility.

¶ 39    In addition, the Commission questioned Dr. Carlson's credibility. In this regard, the Commission noted that Dr. Carlson stated in a report dated December 12, 2012, that claimant was disabled from performing any meaningful work, in part because of "significant mental health issues." The Commission pointed out, however, that Dr. Carlson never made a diagnosis relative to claimant's mental health at any of the 12 visits preceding the December 2012 report and that he

never referred claimant for psychiatric or psychological treatment. Moreover, a review of claimant's medical records from 2008 through 2012 provided no indication that claimant suffered from significant mental health issues. The Commission acknowledged that, in September 2016, Dr. Khang Lai diagnosed recurrent major depressive disorder. The Commission questioned the diagnosis given that neither claimant's chief complaints nor his recounted history included any complaints referencing his mental health status. The Commission also questioned Dr. Carlson's credibility based on the May 2014 letter in which he concluded that claimant could not fly to Illinois for the hearing on his petitions. The Commission noted that Dr. Carlson was unable to recall who asked him to write the letter and that he was unable to offer an explanation as to how he knew the status of claimant's condition in May 2014 when he had not seen claimant for 261 days.

¶ 40    Claimant sought review of the Commission's decision in the circuit court of Cook County. On January 9, 2020, the circuit court confirmed the decision of the Commission. Claimant then sought review in this court.

¶ 41                                    II.  ANALYSIS

¶ 42    On appeal, claimant contends that the Commission erred in denying his petitions for review pursuant to sections 8(a) and 19(h) of the Act. Notably, claimant argues that the Commission's findings that his low-back condition and medical treatment subsequent to the April 28, 2004, arbitration hearing were not causally related to the December 1, 1995, industrial accident were against the manifest weight of the evidence. According to claimant, in so finding, the Commission ignored the nature of his diagnosis and the medical opinions in evidence, all of which support a causal relationship.

¶ 43    The purpose of a proceeding under section 19(h) of the Act is to determine whether a claimant's disability has "recurred, increased, diminished or ended" since the time of the Commission's original decision. 820 ILCS 305/19(h) (West 2016); *Howard v. Industrial Comm'n*, 89 Ill. 2d 428, 429 (1982); *Weaver v. Industrial Comm'n*, 2016 IL App (4th) 150152WC, ¶ 14; *Gay v. Industrial Comm'n*, 178 Ill. App. 3d 129, 132 (1989). Under section 8(a) of the Act, an employer is required to "provide and pay *** for all necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury." 820 ILCS 305/8(a) (West 2016). However, to be entitled to additional compensation under sections 8(a) or 19(h), the claimant must initially establish, by a preponderance of the evidence, some causal relationship between his or her employment and the condition of ill-being for which he or she seeks additional benefits. See *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63 (1989).

¶ 44    The Commission's determinations whether to award expenses under section 8(a) of the Act and whether the claimant's disability has recurred, increased, diminished, or ended for purposes of section 19(h) present factual inquiries to be resolved by the Commission. *Howard*, 89 Ill. 2d at 430; *City of Chicago v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 258, 266-67 (2011); *Gay*, 178 Ill. App. 3d at 132. Likewise, whether a causal relationship exists between a claimant's employment and his or her condition of ill-being is a question of fact for the Commission. *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 52. In resolving questions of fact, it is the function of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded

the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). On review, we will not overturn a factual determination of the Commission unless it is against the manifest weight of the evidence. *Franklin v. Industrial Comm'n*, 211 Ill. 2d 272, 279 (2004); *Howard*, 89 Ill. 2d at 430; *Gay*, 178 Ill. App. 3d at 132. A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Hosteny*, 397 Ill. App. 3d at 675. Although we are reluctant to conclude that a factual determination of the Commission is against the manifest weight of the evidence, we will not hesitate to do so when the clearly evident, plain, and undisputable weight of the evidence compels an opposite conclusion. *Dye v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 10.

¶ 45    Here, the Commission's denials of claimant's section 8(a) and 19(h) petitions were predicated on its determination that claimant's physical condition and medical treatment subsequent to the April 28, 2004, arbitration hearing were not causally related to the December 1, 1995, industrial accident. Specifically, the Commission concluded that claimant's condition of ill-being was "attributable to an undisclosed injury that occurred sometime after [claimant's] April 28, 2004, arbitration hearing." In support of its decision, the Commission cited gaps in claimant's medical treatment, the "questionable completeness" of claimant's medical records, and credibility issues with claimant and Dr. Carlson. Based on our review of the record, however, we conclude that both the objective medical evidence and the medical causation opinions clearly establish that the current condition of ill-being of claimant's low back was causally connected to his December 1995 work injury.

¶ 46    In this regard, we observe that claimant injured his right ankle at work on December 1, 1995. The injury to the right ankle caused an altered gait which stressed the low back and led to enrollment in a work-hardening program. While undergoing work hardening for the right ankle, claimant noticed increased low-back pain and numbness down the right leg. Thereafter, claimant began treating for low-back pain and underwent multiple back surgeries. On February 19, 1997, Dr. Freitag performed an L5-S1 lumbar discectomy with foraminotomies bilaterally. Following this operation, claimant developed lumbar instability. On February 22, 2000, Dr. DeFeo performed a lumbar fusion at L5-S1 with Ray cages. Claimant sought benefits for his back injury, and, following an arbitration hearing in April 2004, the arbitrator found a causal relationship between the condition of ill-being involving claimant's low back and the December 1, 1995, accident. The Commission affirmed and adopted the arbitrator's finding. Neither claimant nor respondent sought judicial review of the Commission's decision and it therefore became the law of the case. *Help at Home v. Illinois Workers' Compensation Comm'n*, 405 Ill. App. 3d 1150, 1151-1152 (2010) (holding that the Commission's causation determination became the law of the case where the claimant failed to seek judicial review).

¶ 47    Claimant testified that following the April 2004 arbitration hearing, he began to experience increasing symptoms in his back and legs which caused him to seek additional medical treatment in June 2006 with Dr. Bennett. Eight months later, claimant commenced care with Dr. Aflatoon, who ordered a CT myelogram of the spine. That study revealed that the left cage device used in Dr. DeFeo's February 2000 lumbar fusion surgery was extending into the L5-S1 neural foramen and compressing the exiting left L5 nerve root. This finding ultimately led to a course of multiple surgeries, including a procedure by Dr. Delamarter to trim the misplaced Ray cage, an operation

by Dr. Carlson to remove and replace the L5-S1 interbody cages and extend the fusion, and a procedure by Dr. Carlson to repair a spinal fluid leak.

¶ 48    In addition to the objective medical evidence set forth above, the medical opinions also support causal relationship. Dr. Carlson testified that claimant's treatment after the April 2004 arbitration hearing had a "very clear line of responsibility and causal relationship" to the lumbar condition on April 28, 2004, which was found to be causally related to the December 1, 1995, work accident. Dr. Carlson also observed that the failure and migration of hardware is a known risk associated with surgery. It was complications related to the migration of hardware from Dr. DeFeo's February 2000 fusion surgery that precipitated the January 2010 surgery performed by Dr. Delamarter and the June 2011 revision surgery performed by Dr. Carlson. Further, the complications which ensued—including pseudomeningocele, arachnoiditis, and adjacent-level disease—are all know risks of spinal surgery and also flowed from the lumbar condition on April 28, 2004, which was found to be causally related to the December 1, 1995, work accident.

¶ 49    The physicians who examined claimant at respondent's request reached similar conclusions. Dr. Shanfield evaluated claimant on March 4, 2008, and May 28, 2009. At the initial evaluation, Dr. Shanfield found that the studies claimant underwent reflected that the Ray cage from Dr. DeFeo's February 2000 surgery was in the left neural foramen and impinging the L5 and S1 nerve root. Dr. Shanfield opined that claimant's complaints were causally related to the February 22, 2000, surgery and the December 1, 1995, work accident. He further concluded that claimant may require further surgery, including an extension of the lumbar fusion. Following the second evaluation, Dr. Shanfield recommended surgery to remove the Ray cages and opined that an anterior and posterior fusion encompassing L4 to S1 seemed "appropriate." Dr. Feinberg

evaluated claimant on September 23, 2015. After physically examining claimant and conducting an extensive review of his medical records, Dr. Feinberg concluded that there was a causal relationship between the December 1, 1995, work injury and claimant's current disability. Respondent cites no medical opinion of record rejecting the notion that the current condition of ill-being of claimant's low back is causally related to his work injury.

¶ 50     In dismissing a finding of causation, the Commission concluded that claimant's condition of ill-being was "attributable to an undisclosed injury that occurred sometime after [claimant's] April 28, 2004, arbitration hearing." In support of this determination, the Commission cited gaps in claimant's medical treatment and the "questionable completeness" of claimant's medical records. However, neither of these factors negates the objective medical evidence. As noted above, the objective medical evidence demonstrates that claimant's current condition of ill-being is related to the misalignment of Ray cages inserted by Dr. DeFeo in February 2000. Moreover, in its underlying decision, the Commission determined that the surgery performed by Dr. DeFeo was causally related to claimant's work accident.

¶ 51     Additionally, there is no evidence of any intervening accident subsequent to the April 28, 2004, arbitration hearing. Claimant denied any subsequent injuries or re-aggravations of his condition since the original injury. Neither the Commission nor respondent cite to anything in the medical evidence of record establishing the existence of an intervening accident. Further, none of the physicians who proffered a medical causation opinion suggest the existence of an intervening accident. Significantly, neither Dr. Shanfield nor Dr. Feinberg suggest that an intervening event was necessary to cause the misalignment of the hardware implanted by Dr. DeFeo on February 22, 2000. Indeed, both Dr. Shanfield and Dr. Feinberg found causation between claimant's current

condition of ill-being and his December 1, 1995, work accident. And, as noted above, it was the December 1, 1995, work accident which started the chain of events leading to claimant's current condition of ill-being. While it is within the province of the Commission to draw reasonable inferences from the evidence (*Hosteny*, 397 Ill. App. At 674), its decision must be supported by the record and not based on mere speculation or conjecture (*Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 215 (2004)). Here, there was no evidence of record from which the Commission could reasonably conclude that claimant's current condition of ill-being was caused by anything other than complications arising from the surgery performed by Dr. DeFeo in February 2000.

¶ 52     The Commission also cited credibility issues with claimant and Dr. Carlson in finding that claimant's condition of ill-being was attributable to an undisclosed injury that occurred after the April 2004 arbitration hearing. As noted above, the primary functions of the Commission include assessing the credibility of the witnesses and drawing reasonable inferences from the evidence. *Hosteny*, 397 Ill. App. 3d at 674. Here, while the Commission's concerns regarding the credibility of claimant and Dr. Carlson are valid and may be relevant to the issue of additional temporary total disability benefits or the nature and extent of claimant's disability, we are unable to conclude that these concerns negate the undisputed objective medical evidence and the multiple causation opinions linking the migration of the hardware to claimant's surgery in 2000.

¶ 53     In short, based on the evidence presented, the Commission's determination that claimant failed to establish causation and that the current condition of ill-being of claimant's back was due to an undisclosed injury is based solely on speculation and conjecture without any support in the record. Quite simply, the undisputed objective medical evidence and the multiple causation opinions link the migrating hardware to claimant's surgery in 2000, which the Commission had

previously concluded was causally related to claimant's December 1995 accident. As such, we conclude that the Commission's decision that claimant failed to prove that the current condition of ill-being of his low back is causally related to his compensable work accident of December 1, 1995, and its resulting denials of his petitions under sections 8(a) and 19(h) of the Workers' Compensation Act (820 ILCS 305/8(a), 19(h) (West 2006)) were against the manifest weight of the evidence. We therefore reverse the judgment of the trial court which confirmed the decision of the Commission, reverse the Commission's finding of no causal connection, and remand the matter to the Commission to: (1) determine what medical expenses incurred by claimant after April 28, 2004, were causally related to his work accident of December 1, 1995; (2) to make an appropriate award of medical expenses based upon that determination; and (3) assess whether claimant is entitled to additional temporary total disability and permanency benefits in light of this order. We express no opinion on whether claimant is entitled to additional temporary total disability or permanency benefits.

¶ 54                                    III. CONCLUSION

¶ 55    For the reasons set forth above, we reverse the judgment of the circuit court of Cook County, which confirmed the decision of the Commission denying claimant's petitions for additional benefits pursuant to sections 8(a) and 19(h) of the Act, reverse the decision of the Commission, and remand the cause to the Commission for further proceedings consistent with this order.

¶ 56    Circuit court judgment reversed; Commission decision reversed; cause remanded to the Commission with directions.